SOLOMON FROHLICH et al.

v.

FRED SEACORD et al.

*Opinion filed June 17, 1899.*

FIDUCIARY RELATIONS—*one cannot use position of trust to appropriate the subject matter thereof to himself.* A member of a standing committee appointed by citizens to represent their interests in an enterprise, cannot be allowed to take advantage of his fiduciary relation and by secret arrangement procure the subject matter of the enterprise for himself, to the detriment of those whose interests it was his duty to protect.

APPEAL from the Circuit Court of Knox county; the Hon. JOHN A. GRAY, Judge, presiding.

C. C. CRAIG, and FLETCHER CARNEY, for appellants.

J. A. MCKENZIE, and E. P. WILLIAMS, for appellees.

Mr. JUSTICE BOGGS delivered the opinion of the court:

This was a bill in chancery by the appellants, against the appellees. The relief sought was a decree ordering that a deed executed by appellee Chappell, as trustee, to appellee Williams, and also a deed from appellee Williams to appellee Seacord, both purporting to convey certain real estate described in the bill, be vacated and canceled, or, in the alternative, that the title held by said appellee Seacord should be decreed to be held in trust for the benefit of the complainants and others standing in the same relation as appellants to the property. A hearing was had on bill, answer, replication and proof. The chancellor entered a decree that the bill be dismissed, to review which this appeal has been prosecuted.

In February, 1894, and prior thereto, appellee Williams was engaged in breeding, developing and selling high-bred trotting horses, and owned and managed extensive stables at Independence, Iowa. He conducted in connection therewith a race-course and fair grounds at the

same place.    The appellants, the appellees (except Wil-
liams) and a number of others, all citizens of Galesburg,
Illinois, moved, primarily and principally, by the desire
to promote the interests of that city, conceived the plan
of inducing Williams to transfer his business to Gales-
burg, and to establish and conduct in that city a district
fair and annual meetings for racing and speeding horses
for purses or premiums, etc.  A public meeting of citizens
interested was held, and communication, through the me-
dium of a committee, opened with Williams.   The latter
came to Galesburg and submitted a proposition to the
committee, which resulted in an agreement, as follows:

"Whereas, C. W. Williams for several years last past
has owned, controlled and managed an extensive es-
tablishment at Independence, Iowa, where he has been
engaged in breeding, developing and selling high-bred
trotting stock; and whereas, a large number of the citi-
zens of Galesburg, Illinois, deem it for their advantage
and of great benefit to the city of Galesburg, and with
that object in view, acting through a committee for that
purpose selected, have secured options for the purchase
of the farm lying within and adjacent to the limits of the
city of Galesburg, and known as the 'Leander B. Rey-
nolds farm,' it also having been arranged that the Gales-
burg Electric Power Company shall, and will as soon as
practicable, extend their street car line to said premises:
It is agreed by and between the undersigned, acting for
themselves and for the other parties who have or may
subscribe towards the object aforesaid, party of the first
part, and Charles W. Williams, of Independence, Iowa,
party of the second part, as follows:  Said party of the
first part shall and will at once purchase and pay for
said Reynolds farm, taking the title therefor to one or
more of their number, who is to hold said title in trust
for the purpose of this undertaking, and shall and will
raise, hold and distribute, as is hereinafter provided, the
sum of $30,000, it being agreed and understood that the

portion of said farm lying north of the center of the Galesburg and Knoxville road, of about forty-three (43) acres, with the exception of one acre including and surrounding the brick dwelling house now occupied as a residence by L. B. Reynolds, is to be platted and laid out in town lots (not to exceed four by twelve rods) as may, by a majority of the parties who may subscribe for the purchase of said lots, be deemed to their best advantage, and the same shall be sold by subscription or otherwise, and conveyed to the respective purchasers when paid for. The said $30,000 shall be paid out and expended as follows: $5000 shall be paid to the party of the second part for his services in the matter, as herein provided; $3500 to be paid to said party of the second part on or before April 1, 1894, and the balance, $1500, upon arrival in Galesburg; that the balance of said sum of $30,000 ($25,000) shall be paid out and expended by and under the direction of said party of the second part in buildings, grading, fencing, track tools, etc., improvement upon the portion of said Reynolds farm which lies south of the Galesburg and Knoxville road, from time to time, as the same is required to pay for such improvements; that the said party of the second part is to have the use and occupation of said residence house and one acre of ground free of rent, except that said party of the second part shall annually, upon the 26th day of March in each year, pay to said party of the first part interest at the rate of seven per cent per annum upon the amount paid by said party of the first part for said one acre of residence property and for said portion of said premises lying on the south side of the Galesburg and Knoxville road. And that at the expiration of three years from the date hereof, in case the said party of the second part shall in all things have fully complied with the undertakings and agreements by him herein agreed to be by him done and performed, and if at that time he shall pay or have paid to the trustee of the party of the first part the amount now paid therefor,

to-wit, the sum, with interest upon the unpaid portion thereof at the rate of seven per cent per annum from the date hereof until the time of payment, and also re-pay all money expended for taxes or assessments levied upon said premises after the date hereof, then said party of the first part shall convey to said party of the second part, free and clear from all encumbrance, the said residence house and acre of ground enclosing or surrounding the same, and also whatever portion of said farm which lies north of the Galesburg and Knoxville road as may not have necessarily been sold to raise the amount required to carry out this undertaking, estimated at the sum of $41,000, and the said portion of said premises lying south of the center of the Galesburg and Knoxville road, together with all buildings, fences and improvements placed thereon. And the said party of the second part hereby agrees and undertakes to abandon and have no further connection with the establishment at Independence, Iowa, lately controlled by him; to at once remove his stables of horses, training utensils, etc., from Independence, Iowa, to Galesburg, Illinois, and at once to give his personal attention to grading a track, erecting proper fences, buildings, etc., upon said portion of said Reynolds farm lying south of the Galesburg and Knoxville road; that he will arrange for and personally conduct a district fair during the present season; that hereafter he will use his best endeavors and judgment and give his undivided attention toward the development and maintenance, year after year, upon said premises, of a first-class district fair and speed establishment for breeding and developing animals of speed; that during the time he shall manage and control said premises for the purposes aforesaid he will not permit thereon the sale of intoxicating liquors, or permit other violations of law. It is understood and agreed that said party of the second part, for the purposes aforesaid, is to have entire and absolute control of said last mentioned premises,

and the sole right of arranging and conducting meetings, as fully as though he was the absolute owner thereof. If, at the expiration of the three years aforesaid, the said party of the second part does not avail himself of the right to purchase said premises aforesaid, then the said party of the first part may at once take possession of said premises and the improvements placed thereon, and this contract shall be at an end.—Dated this 26th day of March, 1894."

The Reynolds farm was purchased, the title thereto being vested in appellee Chappell, as trustee for the parties in interest. The Reynolds farm tract contained 161.58 acres, and was bought at $162 per acre. A portion thereof, consisting of 47.151 acres, situated on the north side of the Galesburg and Knoxville road, was platted into blocks and the blocks into lots, as contemplated by the agreement, except block 7, which was not further subdivided. The dwelling house acre was platted in block 7, which block contained in all about three acres of the grounds. Eighty-seven lots were subscribed for by appellants and the appellees Seacord and Chappell, and other citizens, at the price of $400 per lot. Seventeen lots and block 7 were not sold. An acre of ground, costing $162, being subdivided into lots four rods by twelve rods, (with streets and alleys,) and sold at $400 per lot, produced about $900 under the operation of the scheme adopted. It is clear the purchasers of the lots recognized that in the larger part the purchase price was not established in view of the real value of the ground, but in consideration of the sum of money necessary to be raised to pay for the whole tract and defray the cost of the buildings to be erected and improvements made on that part of the tract south of the Galesburg and Knoxville road, which was to be devoted to purposes of the proposed fair and racing course. The buyers of lots were influenced to purchase almost wholly by considerations which had reference solely to the question of raising a fund to be

expended in establishing the fair and horse show, and the amounts paid for the lots were largely contributions to that fund.  The committee was enlarged by the addition of some twelve or more citizens, and was given power, as a standing committee, to represent the interests of the citizens who had engaged in the enterprise by becoming purchasers of one or more lots.  Appellee Seacord was a member of that committee.  The grounds south of the Galesburg and Knoxville road were improved by the erection of buildings, halls, amphitheatres and the construction of racing tracks, etc., at a total cost of about $30,000, and the price of the entire tract of land comprising the Reynolds farm was paid.  The proceeds of sales of lots proving insufficient, the committee negotiated a loan on their paper, as individual debtors, to the amount of $19,-141.34, or thereabouts.  Appellee Williams entered upon the discharge of that which he had assumed to perform in the agreement hereinbefore set out.  Appellants contend he failed to fulfill his undertakings in more than one respect, but in the view we have taken it is unnecessary to advert to those contentions in detail.

The period of three years mentioned in the agreement expired March 26, 1897.  About October 20, 1896, appellees Seacord and Williams entered into an arrangement to the effect Williams should avail himself of the privileges granted him by the written contract to become the owner of the fair grounds and race-track property situate south of the Galesburg and Knoxville road, and also the unsold lots and block 7 situate north of the said road; · that Seacord should supply the necessary amount to be paid therefor, and that Williams should convey all the said property to said Seacord.  The committee were not advised of the secret arrangement between Williams and Seacord.  They declined, however, to make the deed in October, for the reason, in part, the period specified in the agreement had not expired, and probably, in part, because some of the members of the committee were dis-

posed to contend Williams had not fulfilled his contract in certain respects hereinbefore referred to.

March 26, 1897, Williams demanded of the committee a deed for the unsold lots, the ground included in block 7 and the 115.53 acres south of the Galesburg and Knoxville road, on which last mentioned tract were situate the fair grounds, improvements, the buildings and race-tracks, etc., on payment of the amount required to be paid under the contract. After some discussion, the committee, the appellee Seacord acting as a member thereof, decided to receive the money, and did so, and ordered the trustee, Chappell, to execute a deed to Williams. A deed was accordingly executed by the trustee and delivered to Williams, who, on the same day and immediately thereafter, executed a deed conveying the entire property to appellee Seacord. It was proven Williams made application to the committee for the deed in pursuance of an agreement theretofore made between himself and Seacord that he should obtain a deed for the property for the purpose of conveying it to Seacord. It seems the agreement was perfected in October, 1896, and that, in detail, it was that Seacord should pay Williams the sum of $20,000, being the amount, in round numbers, necessary to be paid to the committee under the contract with Williams, and which was paid by Seacord in order to provide Williams with the sum necessary to be paid the committee; that Williams should appropriate the money so paid by Seacord to the payment to be made to the committee; that Williams should at once, upon receiving the deed for the land, convey the same to Seacord, and that Seacord should pay the taxes on the property for the year 1896, should allow Williams to use the property during the year 1897, and should give Williams a certain "filly" or colt. It further appeared that in pursuance of this contract Seacord did provide Williams with the money necessary to be paid the committee. Seacord, as a member of the committee, participated in the consid-

eration of the questions relating to the right of Williams to receive the conveyance, and kept secret from his associate committeemen the fact that Williams was procuring the title for the express purpose of conveying it to him. It was also testified to, and without contradiction, that a brother committeeman stated to Seacord that he was surprised at Williams' offer to pay the necessary amount to entitle him to a deed, and asked Seacord what he thought about Williams having the money, and that Seacord replied, "Oh! we can't tell; he has been making some money out of his horses and has good friends at Independence, and has probably got the money."

The result of the transaction, if it be upheld, is, that the fair, and racing course exhibitions in connection, are to be abandoned by Williams, and Seacord is to become vested with the ownership of the property which he and his associate committeemen and promoters of the enterprise had procured by an outlay of $47,000, in round numbers, at a cost to him (Seacord) of about $20,000 or $21,000, while his associates in the undertaking are left the owners of lots which had been procured at an outlay of $6500, in round numbers, and which said lot owners hold at a cost to them of nearly $35,000. The inequality and injustice of such a result are manifest. If it be conceded it appeared Williams had complied with his contract and was entitled to demand and receive title to the property upon making the payment which he made, it is manifest the privilege or option to so purchase and become the owner of the lands was given in view of his undertakings specified in the contract. These undertakings are in part expressed in the contract, as follows: "That he will arrange for and personally conduct a district fair during the present season; that hereafter he will use his best endeavors and judgment and give his undivided attention toward the development and maintenance, year after year, upon said premises, of a first-class district fair and speed establishment for breeding and developing animals

of speed. * * * If, at the expiration of the three years aforesaid, the said party of the second part does not avail himself of the right to purchase said premises aforesaid, then the said party of the first part may at once take possession of said premises and the improvements placed thereon, and this contract shall be at an end."

It unmistakably appeared from the proofs Williams did not avail himself of the right to purchase the property with the intention of "giving his undivided attention toward the development and maintenance, year after year, upon the premises, of a district fair," or "a speed establishment for breeding and developing animals of speed." Upon the contrary, it was clearly established by the proof the enterprise had proven a losing venture to Williams, and there is no escape from the conclusion he demanded the right to receive a deed for the land with a view of abandoning further prosecution of the enterprise, and of profiting by such abandonment through the medium of the secret arrangement between himself and Seacord. Of all this Seacord had full knowledge,—indeed, was a participant therein,—and Seacord and Williams acted in conjunction in secreting the fact from the other members of the committee. The committee was representing and acting for the purchasers of the lots. The lot owners had not purchased the lots as an investment, but had knowingly accepted and paid for them at a price which far exceeded their value, as a part of the plan adopted to create a fund to be devoted to the consummation of an enterprise common to them all. The amount paid for the lots was, as all well knew and understood, in much the larger part a contribution to a fund which was intended to be, and which was, appropriated to the payment of the purchase price of the premises included in the deed made by Williams to Seacord and the improvements made upon such property. The enterprise was one in the "development and maintenance" of which the lot owners had a public as well as a private interest,

and which interest they sought to protect by that clause in the contract entered into with Williams which gave them the right to take possession of the premises and the improvements placed thereon in case Williams should not desire to avail himself, under the terms and conditions of the contract, of the right to become the owner of the property. The committee was created for the express purpose of conserving and protecting the interests of the lot owners. Seacord, as a member of the committee, was charged, in conscience and good morals, with the duty and obligation to preserve and promote their interests and rights. His relation to them was that of trust and confidence, and every principle of equity required he should discharge the trust with the utmost fidelity, and prohibited him from acquiring rights in the subject matter of the trust antagonistic to the rights of those whom he represented. The arrangement between himself and Williams had for its purpose the acquisition in himself of the subject matter of his trusteeship, and was inconsistent with the relation he sustained to those associated with him upon the committee and those for whom he and the other members of the committee were acting. It was conducted with secrecy and with intent the committee should remain in ignorance of the purpose of Seacord to possess himself of that which he and other members of the committee were charged with the duty and obligation of preserving and protecting for the benefit of those entitled to it, as against all other persons than Williams.

We have frequently declared the law will not tolerate such transactions on the part of those occupying any position of trust and confidence out of which arise duties pertaining to fiduciary relations. In *Prince* v. *Dupuy*, 163 Ill. 417, we held that no one should be allowed to take advantage of the fiduciary relation which he sustained to another to procure for himself the subject matter of the relation, and declared the principle too familiar to re-

quire elaboration or citation of authority in its support. The doctrine was elaborated and the authorities well collated in *Davis* v. *Hamlin*, 108 Ill. 39. The chancellor should have applied the rule in this case, and decreed that it was the right of those for whom the committee · was acting, to disaffirm the conveyances by which Seacord claims to have become the owner of the premises in question upon equitable terms.

The record does not disclose with requisite accuracy the total amount received by the committee from Williams acting in conjunction with Seacord, nor what benefit, by way of rents or otherwise, if any, Seacord has received from the property, and the record is in other respects insufficient in data to enable us to direct the terms and conditions upon which a final decree restoring the title to the trustee, Chappell, should rest. The principle that he who asks equity must do equity is here applicable, and as the cause is to be remanded the parties may produce further testimony, in order to enable the chancellor to prescribe the terms upon which the complainants shall be entitled to relief.

The decree will be reversed and the cause remanded, with directions to the circuit court to enter a decree vacating and canceling the deed executed by appellee Chappell to appellee Williams, and that from appellee Williams to appellee Seacord, and restoring the title to the premises in question in appellee Chappell, in his capacity as trustee, upon such terms as the court, upon consideration of all testimony the respective parties may produce bearing upon that question, may find to be equitable under all the circumstances disclosed by such testimony. The costs in this court will be adjudged against appellees Seacord and Williams.

*Reversed and remanded.*