(No. 14775.—Decree affirmed.)

THE SPAR MOUNTAIN MINING COMPANY, Appellant, *vs.* MARTIN SCHWERIN *et al.* Appellees.

*Opinion filed October 21, 1922—Rehearing denied Dec. 13, 1922.*

1. PRINCIPAL AND AGENT—*information acquired by agent must be given to the principal.* The relation of principal and agent is fiduciary in character, and it is the duty of the agent to advise the principal of whatever information he acquires concerning the subject matter of the agency in order that the principal may make such use thereof as he shall decide upon, even though the agency is voluntary or gratuitous.

2. SAME—*when purchase by agent does not inure to principal.* Where an agent in charge of his principal's mine advises the principal to purchase adjoining property and informs the principal that he has secured an option for such purchase, the principal cannot delay acceptance to speculate on whether it will prove advantageous, and if the principal takes no definite action until the option expires, a purchase by the agent on his own account will not inure to the principal.

3. SAME—*principal cannot conditionally accept purchase made by agent.* Where an agent has an option to purchase property and has exercised the option and informed the principal of his purchase, the principal cannot accept the transaction on condition that the title is good, but it must accept the purchase as made by the agent if it desires to take advantage of it.

APPEAL from the Circuit Court of Hardin county; the Hon. JULIUS C. KERN, Judge, presiding.

MOSES, ROSENTHAL & KENNEDY, and JAMES A. WATSON, (WALTER BACHRACH, and WALTER H. MOSES, of counsel,) for appellant.

ROEDEL & ROEDEL, and CREIGHTON & THOMAS, for appellees.

Mr. JUSTICE STONE delivered the opinion of the court:

This is a bill by appellant to impress certain real property with a trust and to require appellees to turn over such property to appellant. The cause was heard by the chan-

cellor in open court and the bill was dismissed for want of equity. It comes directly to this court on appeal on the ground that a freehold is involved.

The uncontroverted evidence in the record discloses that certain persons in New York and London, to whom the appellant company afterward became successor, purchased 145 acres of land in Hardin county, Illinois, and proceeded to develop fluor spar mines on the same. This land was purchased at the price of $1000 per acre. Appellee Martin Schwerin, a mining engineer, was employed by the purchasers to investigate the property with a view to mining the same. On December 19, 1918, Schwerin made his report and advised the purchase of the mining rights under certain lands lying north and west of the lands now owned by appellant in this case. The lands referred to in this report were owned by W. C. Green and are known in this case as the Green farm. Schwerin was later employed to take charge of appellant's mining business in Hardin county and went onto the premises for that purpose. This employment continued up to July 1, 1919. From July 1, 1919, he was employed as general manager of the mines of appellant in Hardin county. He made daily and semi-monthly reports of the operations and progress of the work. These reports included letters, maps, reports of assays and location and progress of the mining operations. In addition to this the officials of appellant frequently visited the lands on which such mining operations were being carried on. The maps submitted by Schwerin gave the location of the different tracts of land owned by the company and those surrounding it, including the Green farm. Appellant operated a mine near the boundary line between its property and the Green farm, known as the Green mine. The tract on which this mine is located contains 15 acres purchased from Green and was a part of the Green farm. The opening to the Green mine is about 550 feet east of the boundary line and between appellant's property and the Green

farm.  The operation of the Green mine was in the direction of the Green farm, and as the operation progressed the company had samples of the ore taken out and reports on the thickness and direction of the vein and grade of the ore.  It appears that in March, 1920, Schwerin, in an interview with the officers of appellant in New York, went over the maps showing the progress of the work in the direction of the Green farm and advised that the mining rights in the Green farm be acquired.  The officers of appellant authorized him to pay as much as $500 for a royalty lease on the mineral rights in this land.  The evidence shows that he later attempted to secure such lease, but Green, the owner of the land, refused to treat the matter on the basis of a lease, preferring to sell outright all the land or the mineral rights.  In May, 1920, the treasurer of appellant made an inspection of the mines, and while there was advised by one Hanon to buy the Green farm while it could be done to advantage.  At that time mining operations had extended to within 200 feet of the boundary of the farm.

On June 16, 1920, Schwerin wrote appellant that he had made an offer of $1000 for the mining rights on the Green tract, saying that he had no means of knowing whether it contained spar but that in his judgment it was a valuable property to appellant.  On June 18 Schwerin secured from Green, in his own name, a ten-day option to purchase by quit-claim deed the farm in question at $50 per acre.  This farm was thought to contain 280 acres.  He also secured an option to purchase the mineral rights for $3000.  On June 19 he wired appellant:  "Will you buy quit-claim title to Green farm for $14,000?  Please wire."  Appellant wired, in reply, instructing Schwerin to await its letter of that date.  This letter, received by Schwerin on June 22, is as follows:  "This afternoon we received your teleg., 'Will you buy quit-claim title to Green farm for $14,000?  Please wire,' to which we replied to await our to-day's letter.  On the information which we have, which is practically none,

we certainly would not. If you have not already done so, please write us full particulars,—acreage, prospects, developments, etc.; also we are curious to know why this should have to be done so hastily by wire. We will consider this as best we can on Monday, and if we have anything further to write will do so, but it seems to the writer we will have to have the additional information asked for before we can do anything with intelligence." Schwerin replied to the letter on the 22d, saying that he took an option for ten days, dated June 18, giving a description of the property, and advising the purchase of it for the reason that in case the appellant's property developed favorably, the Green farm would appreciate in value. The evidence shows this letter was received by appellant on June 24. Appellant made no reply to it and did nothing towards exercising the option to buy the Green farm. On June 29 appellant, in writing to Schwerin concerning other matters in connection with its mining business, referred to the matter of the purchase of the Green farm in the following language: "From your letters it would seem you were forming great plans,—a railroad, a new mill and more land. Have you found so much ore that you figure we will soon be lousy with money?" This letter indicates that appellant had decided not to exercise the option, which expired the day before the letter was written. On July 4, replying to appellant's letter of June 29, Schwerin wrote: "As for more land, I still think you should have bought the Green farm for the reasons I gave you on several occasions when it was mentioned by me;" also, "It is just a chance, of course, but since you would not buy it I bought it myself."

The evidence shows that Schwerin entered into a contract of purchase of the farm on June 24 for the sum of $13,437.50. This was four days before the expiration of the option, and while appellant did not exercise the option secured by Schwerin as he advised it to do, it is contended that in the purchase of the land Schwerin must be held to

have been acting as trustee for appellant. Appellant replied to Schwerin's letter of July 4 expressing surprise at his having purchased the property, to which letter Schwerin replied on July 13, setting out the various occasions on which he had urged the advisability of appellant purchasing the land and recalling the various negotiations and correspondence concerning the matter.

Appellees' evidence tends to show that on July 26 appellant's president, A. H. Strong, with one Mills, also connected with appellant, went over the mining property for the purpose of inspection, and a conversation was had between Strong and Schwerin concerning the Green farm. Schwerin's version of the conversation is that Strong asked him if he had purchased the Green farm, and he replied that he had just finished paying for it, and upon inquiry as to what sort of title he secured, told Strong that it was a quit-claim title; that the title was the same as that to the land the company had purchased from Green; that he also told Strong that he had been offered $1000 for the option before he bought the land, and that the option included also the right of purchase of the mineral rights under the land for $3000; that Strong said, "I would like you to give me an option on your purchase," but that he refused; that Strong then asked if he would give him an option on it at an advance over the price he had paid, which he also refused to do; that the next morning he asked Strong if he wanted to buy the Green farm, to which he replied, "I don't know;" that during that day and the next Strong inspected the Green mine and became familiar with the location and general direction of the vein of ore; that in the evening Schwerin told Strong that if he felt the property should be turned over to the company he (Schwerin) would turn it over upon payment to him of the money he had paid out in its purchase; that Strong replied that he didn't want it, and upon being asked, "Why not?" said, "I will not know until I have consulted Lon-

don;" that on July 29 Strong said to Schwerin, "Now that you own the Green farm, do you want to take our property and operate it on your own account?" to which Schwerin replied, "I will figure with you on it; I am much interested." On August 27, 1920, Strong wrote Schwerin that he had been corresponding with the London parties interested in appellant and that they felt generally the same about the Green farm as the rest of the company, but that Schwerin might hear from Strong later about it from London, as he was going to that city. On September 1 Schwerin replied to this letter, reminding appellant that he had asked Strong if the company wanted the farm and that he had replied he didn't know whether it did or not; that on July 29, after Strong had gone over the mines underground, he had again asked him if the company wanted the Green farm; that he replied that he could not say until the London people were consulted. He reminded appellant also that Strong had asked him to give him an option on the farm but that he had refused to do so, and that these matters indicated to him that the company had shown no evidence of an attitude looking towards taking over the property.

On September 7 Strong cabled Schwerin from London that he had discussed the question of the Green farm with the English directors; that they thought the company should take over the property at the purchase price, plus interest and expenses, subject to the title being proved to be valid, and asked Schwerin to cable reply, to which he replied September 9, "Do not agree." On September 10 he also wrote Strong in England calling his attention to previous correspondence as showing that late in July previous, after learning that he had purchased the farm, the company did not say that it wanted it. To this letter Strong replied by cable on September 24, "Without renewing discussion about past would like your views about future, and for this purpose please cable me on what terms you would turn over Green farm to company," to which Schwerin re-

plied by cable that as matters then stood the property was not for sale at any price. On November 10 officers of the company visited the mining property in Hardin county and requested Schwerin to make them a price on the farm, which he refused to do. During this visit Strong suggested to Schwerin that the Rosiclare Mining Company, with whom appellant had been negotiating for the sale of appellant's mining property, was becoming interested, and asked Schwerin if he would make the company a price on the Green farm when the time came to deal with the Rosiclare people, to which he replied, "I will not keep you from making a deal," and Strong said, "All right, Mr. Schwerin; when there is another conference about to occur I will let you know and have you come to New York." In December Schwerin was called to New York and was asked by Strong if he would put a price upon his property if the opportunity came to sell to the Rosiclare people, and he replied, "I will if I sit at the table when the deal is made." This appears to have been agreed to and arrangements were made for a conference, Schwerin being kept informed, in the meantime, as to the developments.

Matters appear to have stood this way for some time, and on January 27 Schwerin wrote appellant that the mining operations in the direction of the Green farm had extended to about 120 feet of the boundary line, and asking appellant to determine whether or not the mine should be driven any further in that direction. Appellant replied, directing that the mining operations continue until within 50 feet of the boundary line, and to let it know when that had occurred. On February 23 Schwerin wired the company to the effect that the mining operations had reached a point 50 feet from the boundary line and that there was six feet of spar on the face of the drift. He was then advised by appellant to discontinue the forward direction and to cut parallel drifts in the ore. This he did, cutting both north and south parallel to the boundary of the Green farm

and within 50 feet thereof. These operations indicated that the vein of spar would be found to be from five and one-half to six feet thick at the boundary line. The work of extending the mine along the boundary line of the Green farm continued until May, 1921, and disclosed that in all probability the vein of ore extended into the Green farm. On August 12, 1921, appellant tendered Schwerin his original purchase price of the farm, with interest, and demanded a quit-claim deed conveying the property to it. The record does not disclose any other communication or conference between appellant and Schwerin concerning the taking over of the farm prior to August 12 and subsequent to December, 1920, when the mine was apparently about to be disposed of to the Rosiclare people. The record discloses no previous demand made on Schwerin to turn over the property to appellant, the only other expression of intention being that cabled from London in September, to the effect that the London people felt the company should take over the property, subject to the title being proved valid.

Appellant's testimony disputes that of Schwerin as to conversations had in July concerning the turning over of the Green farm to the appellant. The record, however, discloses from the correspondence of the parties that Schwerin had in a later letter reminded appellant of two conversations to which he testified, and there appears to have been no denial on the part of appellant in reply. The hearing was in open court before the chancellor, and no finding of fact was made in the decree. We are of the opinion, however, that the evidence preponderates in favor of Schwerin in regard to his offer in July to turn over the property and the failure of appellant to accept the same.

The rules of law applicable in this case are not in dispute. It is conceded that the relation of principal and agent is fiduciary in character; (*Perry* v. *Engel*, 296 Ill. 549;) also that it is the duty of the agent to advise his principal of whatever information he acquires concerning the subject

matter of the agency, in order that the principal may make such use thereof as he shall decide upon. (*Frohlich* v. *Seacord*, 180 Ill. 85; *Prince* v. *Dupuy*, 163 id. 417.) This rule applies even though the agency is that of a mere volunteer. (*Perry* v. *Engel, supra; Davis* v. *Hamlin*, 108 Ill. 39.) It seems clear, however, that the facts in this case do not bring it within the rules referred to. Even though it be conceded that at the time of the purchase of this property by Schwerin it inured to the benefit of appellant, this fact does not give appellant the right to delay the acceptance of that purchase for the purpose of speculating on whether or not its acceptance would be to its advantage or disadvantage. The principal must make his election within a reasonable time, which is usually considered to be as early as practicable under the circumstances of the case. (*Bush* v. *Sherman*, 80 Ill. 160; *Loomis* v. *Loomis*, 28 id. 454.) In this case there was no demand upon Schwerin to turn over the Green farm until nearly fourteen months after he had purchased it and notified appellant of the purchase.

On September 7, 1920, appellant's president, Strong, cabled Schwerin from London that the London directors of the company thought that the company should take over the farm from Schwerin at cost, plus interest and expense, subject to the title being proved valid. Strong and the company at that time knew that Schwerin had but a quitclaim deed to the land in question and that court proceedings might be necessary to prove up the title, since the court house of Hardin county had been burned and the records of land destroyed. Even though this cable as to the judgment of the English directors of the appellant was to be taken as a demand upon Schwerin to turn over the property, it was not an unconditional demand to take the property as Schwerin took it. If appellant desired to take advantage of the purchase of this farm by Schwerin it was bound to take such title as he acquired. The principal must take the transaction of his agent as made by the agent and

not on condition. (*Stemm* v. *Gavin,* 255 Ill. 480.) It also appears from the evidence as herein referred to, that the appellant treated this property as the property of Schwerin and asked him to put a price upon it, and suggested that as he owned this land he also take over the entire mines and operate them in his own behalf. The record also shows that when the sale to the Rosiclare people was being considered it was agreed between appellant and Schwerin that Schwerin would put a price upon the Green farm at which he would sell it with appellant's property, and that he was to be permitted to join in any conference to be had concerning such sale. He was from time to time thereafter advised of conferences or arrangements sought to be made in that regard, and while the sale to the Rosiclare mine people did not take place, it cannot be doubted that the appellant treated this land as belonging to Schwerin. There was no demand made upon Schwerin to turn over this property for more than eight months following the attempt to sell the company property to the Rosiclare people. By the time such demand was made it had become demonstrated that the vein of ore extended into the Green farm. To now afford to appellant the relief here sought would be to say that the principal may hold the acts of his agent in speculation until he determines whether or not they will prove profitable or otherwise, and thus, if the agent's acts be refuted, allow the loss to fall upon him, or if profitable, the principal may take the benefit of such acts. Such an unfair and unconscionable rule can find no sanction in a court of equity. In this case it appears that Schwerin informed his principal of all the conditions concerning the Green farm and its relation to the mining property of the appellant. For more than two years he urged the buying of this land, and when he secured an option on it the same was not exercised by appellant. The record discloses nothing in his conduct, as we view it, that indicates any attempt to take advantage of the relation existing between him and his principal. We

are of the opinion that there has been no breach of faith on his part, and that under the circumstances of this case a trust relation cannot now be said to exist by reason of his purchase of the property in question. The chancellor therefore did not err in dismissing the bill for want of equity.

The decree of the circuit court is therefore affirmed.

*Decree affirmed.*