## UNITED STATES v. INGALLS.

### No. 7451.

United States Court of Appeals for the District of Columbia.

Decided Aug. 5, 1940.

David A. Pine, U. S. Atty., of Washington, D. C., and Alexander Holtzoff and Wilbur Pickett, Sp. Assts. to the Atty. Gen., for appellant.

Jordan R. Bentley, of Washington, D. C., for appellee.

Before STEPHENS, EDGERTON, and RUTLEDGE, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal by the Government from a judgment of the District Court of the United States for the District of Columbia entered in favor of the appellee, hereafter referred to as plaintiff, on two policies of insurance: one a Government policy of ordinary life insurance, converted from war risk insurance, covering total permanent disability; the other, a "rider" policy issued under the provisions of Section 311 of the World War Veterans' Act as amended July 3, 1930, 38 U.S.C.A. § 512b, covering total disability.

The plaintiff filed claims with the Veterans' Administration for benefits under the two policies, but they were disallowed. The present suit was then instituted. At the trial it was stipulated by counsel that the only questions in the case were whether on August 31, 1934. the plaintiff was totally and permanently disabled within the meaning of that phrase under the converted policy, and totally disabled within the meaning of those words under the rider policy. In the converted policy total permanent disability was defined as "any impairment of mind or body which continuously renders it impossible for the disabled person to follow any substantially gainful occupation and which is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it." Under the rider policy total disability was defined as "any impairment of mind or body which continuously renders it impossible for the disabled person to follow any substantially gainful occupation."

A jury trial was waived. At the close of the evidence for the plaintiff—none being introduced for the Government—the

plaintiff moved for judgment on the ground that the greater weight of the evidence supported his case; to the contrary, the Government moved for judgment in its own behalf. The plaintiff's motion was granted. On both the issue of total permanent disability under the converted policy and the issue of total disability under the rider policy, findings of fact in favor of the plaintiff were made by the court, followed by appropriate conclusions of law, and judgment in the plaintiff's favor. A motion for a new trial made by the Government was denied.

■ The sole question for us to determine is whether there was substantial evidence to support the findings in the plaintiff's favor. In answering that question we must take as true all facts which the plaintiff's evidence tends to establish and draw in his favor all inferences fairly deducible from such facts. Lumbra v. United States, 1934, 290 U.S. 551, 553, 54 S.Ct. 272, 78 L.Ed. 492; Gunning v. Cooley, 1930, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720.

■ We think the record discloses ample evidence to support the findings for the plaintiff. It would serve no useful purpose to state all of the evidence. It is sufficient to point out that there was evidence to the following effect: From 1911 until his retirement on August 31, 1934, the plaintiff, Colonel Raymond Eugene Ingalls, was a dental surgeon in the United States Army. In September 1917 while he was in military service overseas, he was admitted to a field hospital in France under observation for a mental disease described in the hospital records as "psychasthenia." About a month later he was admitted to a base hospital in France for "psychosis, manic depressive, in line of duty." In November of the same year he was transferred to St. Mary's Hospital, Hoboken, New Jersey, the cause of admission being described as "neurasthenia (sexual), manifested by mental depression." From that time until the date of his retirement the plaintiff was admitted to and treated at Fort Sheridan Station Hospital; Walter Reed General Hospital, Washington, D. C.; Sternberg General Hospital, Manila, Philippine Islands; General Dispensary, Chicago, Illinois; and Fitzsimons General Hospital, Denver, Colorado—all military hospitals. At these institutions his condition was variously described as "psychoneurosis, neurasthenia, severe"; "neurasthenia"; "depression and insomnia, moderately severe"; "neurasthenia, secon-

dary to eye strain, caused by continuous work with eyes"; "psychoneurosis, neurasthenia"; "ocular muscle imbalance, bilateral; migraine, severe, cause undetermined; astigmatism, compound, hyperopic bilateral, vision 20/200 bilateral"; and he was treated for these conditions. In September 1926 the plaintiff's clinical record at Headquarters, Corps Area, Chicago, indicated that in the opinion of the doctors:

"... the patient had had, at least since 1916, all the typical symptoms of a severe neurasthenia, with apparently a neurotic tendency for even a longer time, which was exaccerbated and brought to a focus in 1916 by the hard work and great responsibility on the Mexican Border, and that the World War with its excitements, increased responsibilities, and advanced rank still further increased the severity of his illness, such that when things did quiet down, it was too late and permanent damage done to the central nervous system, the sympathetic nervous system, and the endocrine system. Thorough and repeated examinations at numerous places only confirmed the diagnosis of neurasthenia and eliminated all other suspicious and possible diagnoses. The chief complaint is referable to the eyes—fatigability after a few minutes' reading, eye muscles get tired and head pains as though from eye-strain. Even moderate mental or physical exertion brings on a marked exhaustion and patient says he is always tired. Insomnia is constant and severe. . . ."

A progress note in the same clinical record, under date of September 9, 1926, shows:

"... that a tentative diagnosis was made of severe neurasthenia with the probability that the eye symptoms are due to same, based on history and symptoms of fatigability, mental depression, insomnia, and nervous repression, and findings of a marked asthenia—weak, flabby muscles, weak, flabby heart, pallor, subnormal temperature, bradycardia, and absence of other pathology. Opinion was expressed, following the complete eye examination with the diagnosis of a compound hyperopic astigmatism, presbyopia, spasma of accommodation following close work, that the eye condition was a local manifestation of his general condition of neurasthenia. The opinion was expressed that the eye examinations show the eye symptoms are due to the general constitutional ailment and form part of the picture of a typical psychoneurosis, psychasthenia, and neurasthenia, manifest-

ed by fatigability—mental, physical, and ocular—insomnia, anorexia, repression of normal impulses, etc. . . ."

On March 5, 1934, in the Fitzsimons General Hospital in Denver, Colorado, the diagnosis was "psychoneurosis, neurasthenic type, severe." On April 21, 1934, the plaintiff's medical card at the same hospital showed: "Final disposition: To home to await retirement on the War Department orders dated April 12, 1934. Degree of disability of 100%."

There was testimony by the plaintiff's private physician, supplied in deposition form, that: In September 1934 the plaintiff had "hyperopic astigmatism, presbyopia, ocular muscular imbalance, migraine, vertigo, and neurasthenia"; no work and complete rest were advised; any active employment would affect both the physical and mental condition by bringing on attacks of migraine, increasing their frequency, and thus affecting the neurasthenia by making it more debilitating; in May 1935 work of any gainful character would have caused serious impairment of the plaintiff's health; and since that date, continuous work would have seriously aggravated the patient's condition and would have provided a "very, very, bad prognosis, which at the time was none too good"; the doctor did not know of any work the plaintiff could engage in.

An acquaintance of the plaintiff who had spent a great deal of time with him since 1935 testified that even in such tasks as steering a boat or fishing, the plaintiff could not exert himself except for a few moments at a time, followed by lying down to rest. The plaintiff's wife testified that since his retirement in 1934 he had once tried to play a little golf but had returned home and collapsed on the bed; that he had also been put into a state of collapse by attempting to sweep the sidewalk after a light snowfall.

In his own behalf the plaintiff testified, among other things, to the following: Some six months before entering the Fitzsimons Hospital at Denver in December 1933 his eyes had continuous migraine, both being very sore with shooting pains; he had pains in the back of his head, hurt all over and suffered complete exhaustion. After retiring in 1934 he just rested; as long as he was quiet he would not have the exhaustion. Most of his nervous exhaustion seemed to fasten on him after breakfast, especially if he had had a bowel movement—even if normal—that seemed to exhaust him. He

tried to take "a training course a week" in radio transmission, but had to give it up because it lasted two or three hours and gave him a terrible headache. He had motored up to 250 miles a day but when driving would feel attacks of migraine and nervous exhaustion coming on slowly and there was nothing to do but rest and relax; he had not driven over an hour continuously without stopping and resting; driving the car would bring on nervous exhaustion and he would get very tired; vertigo and defective vision kept him from driving a long distance and the last four years the longest distance he had driven was about 150 miles a day; he had made no long trips except the trip coming East from Denver when he was to retire from the Army. Compared with his physical condition at the time of retirement, his condition at the time of the trial had not improved any. It seemed to have retrogressed some. He felt exhausted at the time of the trial.

The Government, in its attack on the trial court's ruling, points to a medical examiner's statement in the plaintiff's clinical record at the Walter Reed Hospital in 1926 to the effect that while the plaintiff professed a contrary desire, the examiner was certain that retirement would delight him; and to the same examiner's opinion that there was no evidence of organic disease of the central nervous system, but a neurasthenia, mild and nonincapacitating. The Government stresses: evidence indicating that the plaintiff was an amateur wireless operator and that he spent several hours a day with a wireless apparatus located in his home; evidence that neurasthenia—in the definition of the plaintiff's private physician—was just a general run down condition; and evidence that in answers to questions in an application for a Maryland automobile driver's license, the plaintiff made representations concerning his condition contrary to his testimony about the same. The Government especially urges that if the plaintiff could drive an automobile as much as 250 miles a day and operate a motor boat, he could support himself by driving a taxicab or in some similar work—and in this connection points to the proposition that mere inability to follow one's customary occupation does not constitute total disability. Miller v. United States, 1935, 294 U.S. 435, 441, 55 S.Ct. 440, 79 L.Ed. 977. But, as will appear from the statement of the evidence for the plaintiff above set forth, this argument looks at

the testimony concerning the plaintiff's use of an automobile and motor boat out of context. According to that testimony, he could not operate either a boat or an automobile for any length of time without lying down to rest. The other items of evidence above mentioned as relied upon by the Government may bear upon the weight or credibility of the plaintiff's case, but their ultimate effect in such respects was for the trial court, not for us.

We cannot say that the trial court could not from all of the evidence in the case reasonably have drawn the inference that there was such impairment of the plaintiff's mind or body as continuously rendered it impossible for him to follow any substantially gainful occupation; nor can we say, especially in view of the long continuance of the disability and of the opinion of physicians that there was "permanent damage done to the central nervous system, the sympathetic nervous system, and the endocrine system . . .," that the trial court could not find it reasonably certain that the disability would continue throughout life.

Even if it should be conceded that an inference might be drawn from the evidence different from that drawn by the trial court, that would not make reversal requisite. Where two different conclusions may reasonably be drawn from uncontroverted evidence, the question as to which should be drawn is for the trial court and not for the appellate tribunal. Gunning v. Cooley, 1930, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; United States v. Gamble-Skogmo, Inc., 8 Cir., 1937, 91 F.2d 372, 374; Hearst Radio, Inc. v. Good, 1937, 67 App.D.C. 250, 251, 91 F.2d 555, 556; United States v. Stewart, 1932, 61 App.D.C. 115, 58 F.2d 520.

Affirmed.