## UNITED STATES v. WASHINGTON DE-HYDRATED FOOD CO.*

### No. 10803.

Circuit Court of Appeals, Eighth Circuit.

April 24, 1937.

*Rehearing denied May 28, 1937.

Herbert H. Freer, Asst. U. S. Atty., of St. Louis, Mo. (Harry C. Blanton, U. S. Atty., of Sikeston, Mo., and Mastin G. White, Solicitor, U. S. Department of Agriculture, P. D. Cronin and J. B. O'Donnell, Attys., U. S. Department of Agriculture, all of Washington, D. C., on the brief), for the United States.

Henry H. Stern, of St. Louis, Mo. (Robert Burnett, B. L. Liberman, and Burnett, Stern & Liberman, all of St. Louis, Mo., on the brief), for appellee.

Before GARDNER and SANBORN, Circuit Judges, and MUNGER, District Judge.

SANBORN, Circuit Judge.

The United States, in April, 1935, filed a libel in the court below under section 10 of the Federal Food and Drugs Act of June 30, 1906 (34 Stat. 768, 771, 21 U.S.C. § 14 [21 U.S.C.A. § 14]), praying for the seizure and condemnation of 993 sacks, more or less, of apple chops (dehydrated sliced or chopped apples used for making apple butter) which had been shipped by the appellee from Yakima, Wash., to the account of the American Syrup and Sorghum Company at St. Louis, Mo. The apple chops were alleged to be adulterated within the meaning of section 7 of the Food and Drugs Act (21 U.S.C. § 8 [21 U.S.C.A. § 8]) in that they contained added poisonous and deleterious ingredients, namely, arsenic and lead, which may render the chops injurious to health.

The appellee appeared as claimant and filed an answer denying that the apple chops were adulterated within the meaning of the Food and Drugs Act. The case came on for trial before the court, a jury having been waived. The government called as witnesses five experts whose opinion evidence tended to prove that the apple chops and the apple butter which would be produced from the chops would have such a content of lead and arsenic as might render the chops and the apple butter injurious to health. The claimant called three experts, whose opinions indicated their belief that the quantities of lead and arsenic which were in the apple chops would not produce an apple butter which would or might be injurious to health. The court found in favor of the appellee. Its findings are set forth in the footnote.*

---

*(1) That Washington Dehydrated Food Company is and at all times herein mentioned was a corporation organized and existing under and by virtue of the laws of the state of Washington.

(2) That Washington Dehydrated Food Company was and is the owner and shipper of the 993 sacks, more or less, apple chops referred to and constituting the subject matter of said libel, and has asserted claim to the same as such owner and shipper.

(3) That said apple chops were transported from the state of Washington to the state of Missouri in interstate commerce for sale.

(4) That apple chops are dehydrated sliced apples, the process of manufacturing being substantially as follows: The raw apples after being shipped to the claimant are washed and cleansed to remove as much of the spray residue—which spray consists of arsenate of lead placed on the apple blossoms and maturing apples to prevent them from being attacked by the coddling moth—as possible and after being washed and cleansed are sliced without peeling or coring. The slices are then dehydrated, removing all of the water from the apples and reducing the volume of the apples to one-fifth of their former volume.

(5) That the apple chops constituting the subject matter of the libel had a content of lead, expressed as metallic lead, ranging from .056 grains per pound of product to .164 grains per pound, and an arsenic content, in the form of arsenic trioxide, ranging from .018 grains per pound to .081 grains per pound; said arsenic and lead being derived from the arsenate of lead sprayed on the raw apples.

(6) That apple chops are not as such used for food, drink, confectionery or condiment by man or other animals, whether simple, mixed or compound, but that they are used in the manufacture of other articles, such as apple butter, syrups and cider, which are used as food, drink, confectionery or condiment by man or other animals; and that the apple chops, the subject matter of this libel, were transported to St. Louis to be manufactured into apple butter.

(7) That in the process of making apple chops into apple butter the apple chops are placed in a converter and cooked to a very high temperature and water and sugar added, approximately

The vital findings of fact are these:

"(8) That the residue of the substances used in spraying growing apples did not constitute the addition of a poisonous or other deleterious ingredient which might render the apple chops in question injurious to health; that the apple chops in question were not adulterated within the Food and Drug Act.

"(9) That the apple butter into which the apple chops in this case would be manufactured would not have an arsenic or lead content which might render the apple butter injurious to health;' that the apple butter would not be adulterated within the Food and Drug Act."

The trouble with these apple chops was that they were made of apples which had been sprayed with arsenate of lead during the growing season, and that a small residue of the spraying compound had remained upon the apples after washing and had been carried over into the apple chops. The evidence is undisputed that apple chops as such are not used as food, but are used in the making of apple butter, jelly and cider, the particular apple chops here involved being intended for use in the making of apple butter. It is also undisputed that apple butter made from apple chops containing arsenate of lead will retain about one-fifth as much of the poisonous substance as is contained in the chops from which the butter is made.

The contention of the government upon this appeal is that the evidence was virtually undisputed, and that it compelled a finding by the trial court that these apple chops have an arsenic and lead content which may render them, and the product to be made from them, injurious to health.

We think it is unnecessary to set forth the evidence in detail. We have already stated that it consisted entirely of opinions of experts who differed materially as to the amount of arsenic and lead which would or which might make a food product injurious to health, as to how much lead and arsenic could safely be taken into the human system, as to the solubility of arsenic and lead compounds in the gastric juices, as to human tolerances for lead and arsenic both in organic and in inorganic forms, and as to the ability of the human system to throw off excess amounts of these poisons accumulated over long periods of time. The government's experts were of the opinion that even infinitesimal amounts of these poisons contained in food might, if such food was regularly eaten during a considerable period of time, produce in some consumers chronic lead or arsenic poisoning; while the claimant's experts were not in accord, and expressed the belief that lead and arsenic were largely insoluble in the gastric juices and that the body would throw off excess amounts of such poisons accumulated through the eating of food products containing such amounts as were found in the apple chops here involved and in the apple butter which would be made therefrom. It is obvious that the question whether such an amount of arsenate of lead as is present in these apple chops and would be present in the apple butter made from them may make the chops and the resulting butter injurious to health, is, under the evidence, a controversial and doubtful question of fact. It is to be noted, in this connection, that no expert who testified upon the trial was able to say that he knew of any case of lead or arsenic poisoning resulting from eating apples which had been sprayed with arsenate of lead, or the products of such apples.

The burden of proving the facts alleged in this libel as the basis for the condemnation of the apple chops was upon the government. The duty of passing upon the credibility of the witnesses and the

---

the original amount of water previously eliminated in the dehydrating of the raw apple being restored; and that before the apple butter is completed the pomace or pulp is removed and that a good deal of the spray residue is found in the calyx and stem ends of the apple which are contained in the pulp; that the finished apple butter will have a content of arsenic and lead of one-fifth, or less than one-fifth, of the arsenic and lead content of the apple chops from which the apple butter is manufactured.

(8) That the residue of the substances used in spraying growing apples did not constitute the addition of a poisonous or other deleterious ingredient which might render the apple chops in question injurious to health; that the apple chops in question were not adulterated within the Food and Drug Act.

(9) That the apple butter into which the apple chops in this case would be manufactured would not have an arsenic or lead content which might render the apple butter injurious to health; that the apple butter would not be adulterated within the Food and Drug Act.

weight of their evidence, and of determining the issues of fact, was that of the trial court. While the trial judge, in determining the issues of fact, was not free to disregard the uncontradicted evidence of unimpeached and credible witnesses, he was not obliged to accept as true and controlling evidence which, although uncontroverted, might be regarded as unreasonable or improbable, or from which reasonable men might honestly draw different conclusions. Quock Ting v. United States, 140 U.S. 417, 11 S.Ct. 733, 851, 35 L.Ed. 501; F. T. Dooley Lumber Co. v. United States (C.C.A.8) 63 F.(2d) 384, 388, and cases therein cited; Reiss v. Reardon (C.C.A.8) 18 F.(2d) 200, 202; Rasmussen v. Cresly (C.C.A.8) 77 F.(2d) 252, 254.

Where a jury is waived, a trial judge functions as both judge and jury, and his findings of fact are in all respects as final and conclusive as a verdict of a jury would have been had the issues of fact been determined by verdict.

"In Dooley v. Pease, 180 U.S. 126, 131, 21 S.Ct. 329, 331, 45 L.Ed. 457, the court said:

" 'Where a case is tried by the court, a jury having been waived, its findings upon questions of fact are conclusive in the courts of review, it matters not how convincing the argument that upon the evidence the findings should have been different. Stanley v. Supervisors [of Albany County], 121 U. S. [535] 547, 7 S.Ct. 1234, 30 L.Ed. 1000, 1002.

" 'Errors alleged in the findings of the court are not subject to revision by the circuit court of appeals, or by this court, if there was any evidence upon which such findings could be made. Hathaway v. National Bank, 134 U.S. [494] 498, 10 S.Ct. 608, 33 L.Ed. 1004, 1006; St. Louis v. Rutz, 138 U.S. [226] 241, 11 S.Ct. 337, 34 L.Ed. 941, 946; Runkle v. Burnham, 153 U.S. [216] 225, 14 S.Ct 837, 38 L.Ed. 694, 697.'

"See, also, United States v. Worley (C.C.A.8) 42 F.(2d) 197, 199; Majestic Co. v. Orpheum Circuit (C.C.A.8) 21 F.(2d) 720, 731; Simmons v. Utah Copper Co. (C.C.A.8) 15 F.(2d) 780, 782.

"A finding of fact contrary to the weight of the evidence is an error of fact which cannot be reviewed. Wear v. Imperial Window Glass Co. (C.C.A.8) 224 F. 60, 63; Allen v. Cartan & Jeffrey Co. (C.C.A.8) 7 F.(2d) 21, 22; Denver Live Stock Commission Co. v. Lee (C.C.A.8) 18 F.(2d) 11; Federal Intermediate Credit Bank v. L'Herisson (C.C.A.8) 33 F.(2d) 841, 843." F. T. Dooley Lumber Co. v. United States, (C.C.A.8) 63 F.(2d) 384, 388. See, also, Davies v. Home Trust Co. (C.C.A.8) 83 F.(2d) 124; Clark v. Mutual Loan & Investment Company (C.C.A.8) 88 F.(2d) 202.

The situation here is not materially different from that described in United States v. Lexington Mill & Elevator Co., 232 U.S. 399, at page 407, 34 S.Ct. 337, 339, 58 L.Ed. 658, L.R.A.1915B, 774, as follows:

"Without reciting the testimony in detail it is enough to say that for the government it tended to show that the added poisonous substances introduced into the flour by the Alsop Process, in the proportion of 1.8 parts per million, calculated as nitrogen, may be injurious to the health of those who use the flour in bread and other forms of food. On the other hand, the testimony for the respondent tended to show that the process does not add to the flour any poisonous or deleterious ingredients which can in any manner render it injurious to the health of a consumer. *On these conflicting proofs the trial court was required to submit the case to the jury.*" (Italics supplied.)

In determining the ultimate fact, the court below was not bound to accept opinions of expert witnesses as conclusive. Expert opinions are controlling only in so far as found to be reasonable, and their weight is for the trier of the facts to determine. No rule of law compels him to give a controlling influence to opinions of experts or to surrender his own judgment. The Conqueror, 166 U.S. 110, 131, 133, 17 S.Ct. 510, 41 L.Ed. 937; Ætna Life Ins. Co. v. Ward, 140 U.S. 76, 88, 11 S.Ct. 720, 35 L.Ed. 371; Baltimore & O. R. Co. v. Groeger (C.C.A. 6) 288 F. 321, 323, reversed on other grounds 266 U.S. 521, 45 S.Ct. 169, 69 L. Ed. 419; Norton v. Jensen (C.C.A.9) 49 F. 859, 864; Baltimore & O. R. Co. v. Commissioner (C.C.A.4) 78 F.(2d) 460, 465; United States v. Bowman (C.C.A.10) 73 F. (2d) 716, 721; Head v. Hargrave, 105 U.S. 45, 49, 26 L.Ed. 1028; Dayton Power & Light Co. v. Public Utilities Commission, 292 U.S. 290, 299, 54 S.Ct. 647, 652, 78 L. Ed. 1267.

What the government really seeks is a reversal of the judgment on the ground that the trial court decided an issue of fact contrary to the weight of the evidence. This court has no power to retry the action

and to render such judgment as in its opinion should have been rendered by the trial court. Geiger v. Tramp (C.C.A.8) 291 F. 353, 355.

The judgment is affirmed.