### UNITED STATES v. GAMBLE-SKOG-MO., Inc.

### No. 10801.

Circuit Court of Appeals, Eighth Circuit.

July 29, 1937.

---

Louise Foster, Sp. Asst. to the Atty. Gen. (James W. Morris, Asst. Atty. Gen., Sewall Key, J. Louis Monarch, and E. W. Pavenstedt, Sp. Assts. to Atty. Gen., and George F. Sullivan, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., on the brief), for the United States.

W. P. Berghuis, of Fergus Falls, Minn., for appellee.

Before STONE, SANBORN, and THOMAS, Circuit Judges.

SANBORN, Circuit Judge.

The question presented by this appeal is whether in 1932 Gamble-Skogmo, Inc., a retailer and the operator of a large number of chain stores, was a "manufacturer" or "producer" of certain household type electric refrigerators which it purchased, and hence liable for the excise tax of 5 per cent. of the selling price thereof, under the provisions of section 608 of the Revenue Act of 1932,

47 Stat. 169, 263 (26 U.S.C.A. § 1420 et seq. note).

The government levied and collected from the taxpayer a tax of $5,565.82 for the period June 21, 1932 (the effective date of the act), to December 28, 1933, on the ground that it was the manufacturer or producer of the refrigerators in question. The taxpayer applied for a refund upon the ground that it was neither the manufacturer nor the producer. Its claim for refund was denied; this action was brought by it to recover the tax; and from a judgment in the taxpayer's favor the government has appealed.

Briefly and generally, the facts are as follows: Prior to 1932 the taxpayer did not sell electric refrigerators in its retail stores. Late in 1931 or early in 1932 it decided to add refrigerators to its line of merchandise. Various manufacturers were solicited to submit bids for furnishing it completed electric refrigerators. For the purpose of enabling the taxpayer to make a comparison of bids, it requested the manufacturers to "break down" their bids to show the price of the cabinet or box and the price of the freezing unit. (A complete refrigerator consisted of a cabinet and a freezing unit.) The Puffer-Hubbard Manufacturing Company, of Minneapolis, Minn., was the low bidder. Its bid showed the price of the cabinet, which included its profit, and the price of the freezing unit, which equalled the cost thereof plus freight and an installation charge of $1.50. The freezing unit which Puffer-Hubbard proposed to furnish was known as the "Domestic" and was manufactured in Ohio. Shortly after the bid was submitted, the manager of Puffer-Hubbard learned that the Domestic freezing unit had given trouble, and he proposed to the taxpayer that a unit known as the "Zerozone," manufactured by the Zerozone Corporation, of Chicago, Ill., be substituted. The Zerozone unit was more expensive than the Domestic, and required a corresponding increase in Puffer-Hubbard's bid. In February, 1932, a representative of the Zerozone Corporation conferred in Minneapolis with representatives of Puffer-Hubbard and of the taxpayer. The Zerozone Corporation was willing to supply units, provided it could secure an immediate commitment for a large number. The taxpayer estimated its needs for the year 1932 at 2,000 refrigerators. The Zerozone Corporation was willing to accept an order for 2,000 freezing units, but, because of the shaky financial condi-

tion of Puffer-Hubbard, it would not extend to it the necessary credit. For the same reason, the taxpayer was unwilling to advance to Puffer-Hubbard sufficient funds to enable Puffer-Hubbard to purchase the units. It was finally agreed that the Zerozone Corporation should ship the units to Puffer-Hubbard to enable it to complete the refrigerators, and that the units, as they were shipped to Puffer-Hubbard, should be billed to the taxpayer. Two thousand units were thereupon ordered from the Zerozone Corporation. At the same time—about February 15, 1932—the taxpayer gave to Puffer-Hubbard a blanket order for 1,000 "Coronado Electric Refrigerators," that being the name which the taxpayer intended to apply to its refrigerators. On March 21, 1932, the taxpayer gave another order to Puffer-Hubbard for 1,000 "Coronado Cabinets." About 1,350 of the Zerozone units were shipped to Puffer-Hubbard and installed by it in the refrigerator cabinets for a charge of $1.50 per unit, which was the installation charge included in its original bid. This installation was a simple operation which required no mechanical skill. Each refrigerator cabinet was so constructed that the freezing unit could be inserted into the cabinet and fastened by turning up six screws. After the refrigerators were completed by Puffer-Hubbard, they were inspected by the taxpayer, were then crated by Puffer-Hubbard, and shipped by it to such of the taxpayer's stores as the taxpayer directed. Some of the refrigerators were to be distributed from the taxpayer's warehouse in Chicago. In order to save freight on the freezing units, Puffer-Hubbard suggested that the units for those refrigerators be delivered by the Zerozone Corporation to the taxpayer's Chicago warehouse, that Puffer-Hubbard ship the cabinets from Minneapolis to the Chicago warehouse, and that the taxpayer have one of its employees there insert the freezing units in the cabinets. This procedure was followed with respect to some 650 of the refrigerators, and as to all of these Puffer-Hubbard waived its installation charge of $1.50 per freezing unit. All of the freezing units furnished for all of the refrigerators were paid for by the taxpayer under its arrangement with Puffer-Hubbard and the Zerozone Corporation.

The Revenue Act of 1932 went into effect on June 21, 1932. In its bills to the taxpayer for all refrigerators shipped after that date, Puffer-Hubbard added the 5 per cent. tax imposed upon it as the manufacturer and producer of the refrigerator cabinets.

The trial court found that the taxpayer ordered 2,000 completed refrigerators from Puffer-Hubbard; that the latter ordered freezing units from Zerozone; that the taxpayer, as an accommodation to Puffer-Hubbard, paid the Zerozone Corporation for the freezing units, thus financing their cost; that Puffer-Hubbard made a charge of $1.50 for installing the freezing units, in accordance with its original bid; and that the taxpayer was not the manufacturer or producer of the refrigerators.

The government contends that the evidence does not warrant the finding that the taxpayer was not the manufacturer or producer of these refrigerators. It contends that the evidence compels a finding that the taxpayer bought for itself freezing units from the Zerozone Corporation; that it bought only cabinets from Puffer-Hubbard; that it employed the latter to assemble the complete refrigerators, with the exception of those which the evidence shows the taxpayer itself assembled in its Chicago warehouse; and that it was the manufacturer or producer of the refrigerators.

It must be kept in mind that, when an action at law is tried to the court, its findings upon questions of fact are conclusive in the courts of review no matter how convincing the argument that, under the evidence, the findings should have been different (Stanley v. Board of Supervisors of Albany County, 121 U.S. 535, 547, 7 S.Ct. 1234, 30 L.Ed. 1000); that alleged errors in the findings of the court are not subject to revision by a Circuit Court of Appeals if there was any evidence upon which such findings could be made; and that findings of fact which are contrary to the weight of the evidence constitute errors of fact which cannot be reviewed. United States v. Washington Dehydrated Food Co. (C.C.A.8) 89 F.(2d) 606, 609. Where two different conclusions may honestly and reasonably be drawn from uncontroverted evidence, the question as to which inference shall be drawn is a question for the trial court to determine, and its finding will not be disturbed upon review. F. T. Dooley Lumber Co. v. United States (C.C.A.8) 63 F.(2d) 384, 388; Reis v. Reardon (C.C.A.8) 18 F.(2d) 200, 202; Rasmussen v. Gresly (C.C.

A.8) 77 F.(2d) 252, 254; United States v. Washington Dehydrated Food Co., supra, 89 F.(2d) 606, 609.

Taking that view of the evidence in this case which is most favorable to the taxpayer, as we are obliged to do under the circumstances, it appears that the taxpayer never had any intention of manufacturing or producing refrigerators. It intended to buy completed refrigerators from some manufacturer. It solicited bids for completed refrigerators, the bids to be "broken down" solely for purposes of comparison. Puffer-Hubbard was the low bidder. Had it not been for the discovery that the freezing unit upon which its bid was based was unsatisfactory, or had it not been for the fact that Puffer-Hubbard's financial condition was such that it was unable to finance the purchase of 2,000 units from the Zerozone Corporation, no suggestion that the taxpayer had manufactured or produced these refrigerators, which it procured for distribution to its trade, would ever have been made. Had the Zerozone Corporation extended credit to Puffer-Hubbard, or had the taxpayer paid Puffer-Hubbard for the freezing units or for the completed refrigerators in advance, this controversy would have been avoided. The trial court was evidently unable to see any justifiable distinction between furnishing Puffer-Hubbard with cash to buy the freezing units and furnishing the manufacturer of the freezing units with the cash to enable Puffer-Hubbard to comply with its bid as amended.

We think that the inference which the trial court drew from the evidence— namely, that the arrangement between the taxpayer, Puffer-Hubbard, and the Zerozone Corporation amounted to advancing to Puffer-Hubbard a sufficient amount to enable it to carry out its bid—was a permissible inference, and that the evidence did not compel that court to find that the taxpayer bought the freezing units for its own account and became the owner of them and merely employed Puffer-Hubbard to manufacture for it or assemble for it the complete refrigerators. The fact that the last order given to Puffer-Hubbard was for "1,000 Coronado Cabinets" we do not regard as significant, since the evidence indicates that, with the exception of about 650 cabinets which were sent to the taxpayer's Chicago warehouse, completed refrigerators were furnished to it upon this order just as under the former order for 1,000 complete refrigerators.

As to all of the refrigerators which were completed by Puffer-Hubbard, we think there is substantial evidence which supports the finding that the taxpayer did not manufacture nor produce them.

The government insists that what the taxpayer did in having assembled and in assembling refrigerators made it a "manufacturer" or "producer" under a long-settled administrative construction or definition of those words as used in prior excise tax laws. It seems that under section 600 of the War Revenue Act of October 3, 1917 (40 Stat. 300, 316) manufactured articles were first subjected to an excise tax to be paid by the manufacturer, producer, or importer. Similar provisions are found in section 900 of the Revenue Act of 1918 (40 Stat. 1057, 1122), section 900 of the Revenue Act of 1921 (42 Stat. 227, 291), section 600 of the Revenue Act of 1924 (43 Stat. 253, 322), and section 600 of the Revenue Act of 1926 (44 Stat. 9, 93). We think it is not necessary to discuss the Treasury Regulations relating to the terms "manufacturer" and "producer" as used in those acts, because we find in none of these regulations any provision which makes a retailer who extends credit to or finances a manufacturer either a manufacturer or a producer of the goods purchased by it from the manufacturer.

Treasury Regulations 46, art. 4, contains the following definition of a "manufacturer" or "producer" under the 1932 act, here involved:

"As used in the Act, the term 'producer' includes a person who produces a taxable article by processing, manipulating, or changing the form of an article, or produces a taxable article by combining or assembling two or more articles.

"Under certain circumstances, as where a person manufactures or produces a taxable article for a person who furnishes materials and retains title thereto, the person for whom the taxable article is manufactured or produced, and not the person who actually manufactures or produces it, will be considered the manufacturer.

"A manufacturer who sells a taxable article in a knockdown condition, but complete as to all component parts, shall be liable for the tax under Title IV and not the

375

person who buys and assembles a taxable article from such component. parts."

If the court below had found that the taxpayer purchased the units from the Zerozone Corporation for its own account, and the cabinets from Puffer-Hubbard, and employed Puffer-Hubbard to assemble the complete refrigerators, the taxpayer would have fallen within the definition of a manufacturer or producer; but, as a purchaser of complete refrigerators from the manufacturer thereof, to which it had, in substance, made an advance to enable the manufacturer to fulfil its contract, it did not, we think, become itself a manufacturer or producer.

The contention that, by inserting the freezing units in 650 cabinets in Chicago, at the suggestion of Puffer-Hubbard, in order to reduce freight charges, the taxpayer became a manufacturer of those particular refrigerators, we regard as without merit for two reasons: (1) The installing of the units was a trivial operation which we think did not rise to the dignity of manufacturing [see Thurman v. Swisshelm (C. C.A.7) 36 F.(2d) 350]; and (2) in assembling the refrigerators in Chicago the taxpayer was acting as agent for Puffer-Hubbard.

The cases relied upon by the government to indicate that the assembling done by the taxpayer in Chicago constituted manufacturing, namely, Foss-Hughes Co. v. Lederer (C.C.E.D.Pa.) 287 F. 150, involving the 1917 Revenue Act, and Klepper v. Carter (C.C.A.9) 286 F. 370, involving the Revenue Act of 1918, are distinguishable from this case. In the Foss-Hughes Case the taxpayer, who was a retailer, bought truck chassis, and employed an independent contractor to place bodies thereon, and then sold the completed trucks. In the Klepper Case, the truck chassis were purchased by a retailer from one manufacturer, while bodies were purchased from another, and they were then assembled by the retailer on his own account. Neither case involved such a situation as this, where it is apparent that the retailer had bargained for complete refrigerators, and where the only acts which it performed which could in any way be said to indicate that it itself participated in the manufacture of the refrigerators were acts done by it at the instance of and for the actual manufacturer.

The judgment is affirmed on the ground that the findings of the court are sustained by substantial evidence.