### GRIP NUT CO. v. SHARP.

### SHARP v. GRIP NUT CO. et al.

### No. 8677.

Circuit Court of Appeals, Seventh Circuit.

June 30, 1945.

Writ of Certiorari Denied Oct. 8, 1945.

See 66 S.Ct. 55.

---

See also 145 F.2d 518.

Lawrence J. West, Francis Heisler, and Ephraim Banning, all of Chicago, Ill., for Sharp, appellant.

Bernard A. Schroeder, Charles J. Merriam, George A. Chritton, Don M. Peebles and Chritton, Wiles, Schroeder, Merriam & Hofgren, all of Chicago, Ill., for Grip Nut Co., appellee.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This is the third appearance of this case here. Now we are concerned with an appeal from a decree which dismissed defendant's counterclaim for want of equity and which held that plaintiff was vested with a free shop right under patents 1794737, 1795517, 1937253, 1902912, 2007310, 2054393, 1795518, and 1753250; that plaintiff, subject to the payment of $3,750, was the equitable owner of patents 2024069, 2024070, 1976694 and a two-thirds interest in patent 1753250; and that by reason of its

rights and interests in the patents plaintiff has not infringed upon any patent rights of defendant. The decree further adjudged that defendant forthwith execute an assignment of the entire right, title, and interest to patents 2024069, 2024070, 1976694 and of a two-thirds interest in patent 1753250 and deliver for record the unrecorded assignment by which William E. Sharp acquired patents 2024069 and 2024070 from John H. Sharp.

The action was brought by plaintiff for a declaratory judgment against John H. Sharp. In its complaint plaintiff alleged that John H. Sharp had charged it with infringing his patents and asserted that its defense was license and equitable title to the patents, and prayed that the rights of the parties be adjudicated. By its amended and supplemental complaint filed March 2, 1942, plaintiff alleged that Minnie E. Sharp, individually and as executrix of the estate of William E. Sharp, deceased, had asserted that certain products sold by plaintiff were covered by United States Patents which were her personal property. In this complaint plaintiff denied that it had infringed any patents belonging to Minnie E. Sharp and prayed for a declaratory judgment confirming plaintiff's right to continue its manufacture free from any claim of infringement by defendant. To this complaint John H. Sharp answered, disclaiming all interest in the patents, and Minnie E. Sharp, in her answer, asserted ownership of the patents, and filed a counterclaim charging plaintiff with infringement.

The controlling facts appearing from the evidence are that on January 16, 1914, William E. Sharp entered into a ten-year employment contract with plaintiff under which he was to receive annually a salary of $10,000, stock in the company, and a certain commission upon all sales in excess of $450,000. By the contract Sharp agreed to assign to plaintiff all inventions relating to bolts or nuts, or means for making bolts or nuts.

On October 1, 1918, the contract of 1914 was superseded by a new contract under which Sharp was to receive a salary of $15,000 per year and 25% of the net profits in excess of $100,000 a year, for which Sharp was to devote his services to plaintiff's business, advance the interests of the company, and assign to plaintiff any patents that he might obtain on inventions relating to bolts or nuts. The contract also provided that if Sharp died during the contract period, plaintiff would purchase all of Sharp's stock at book value to be determined by a specific formula.

During the period between 1914 and 1923 Sharp made certain inventions which he assigned to plaintiff. When the contract of 1918 expired it was not renewed, but Sharp remained in plaintiff's employ as president and general manager. The relationship between Sharp and the majority stockholders, who were officers and directors of plaintiff, was extremely friendly and complete trust and confidence was reposed in Sharp, who at all times showed great interest in promoting the welfare of the company. For the services rendered by Sharp from October 1, 1923 to 1930 inclusive, he received $20,000 per year; for 1931 and 1932, $12,000 per year; and for 1933, $9,600.

Between September 30, 1923, the date of the expiration of the 1918 contract, and his death, June 4, 1934, Sharp was in complete charge of plaintiff's manufacturing, sales and patent policies, and during this period made a number of inventions. These Sharp placed at plaintiff's disposal and continued to act as he had done during the life of the 1918 contract. The most important of these developments were covered by patents 1794737, 1795517, and 1937253, on machinery and methods of making the nut blanks out of which plaintiff's products were subsequently fabricated. Another invention was a nut covered by patent 1902912. Some nuts covered by this patent were manufactured, but the manufacture was abandoned in 1932 or 1933, and the inventions covered by patents 1795518, 2007310, and 2054393 were not put into actual use. Patent 1753250 was issued in Sharp's name conjointly with Sandstrom and Ridlon, both employees of plaintiff. Sharp secured an assignment to himself of Sandstrom's and Ridlon's interest, so that the entire patent issued to him.

On May 16, 1932, plaintiff entered into an employment contract with Harley E. Anderson to design new products. Anderson's contract required him to assign any invention he might make to plaintiff for which, in addition to his salary, he was to receive five per cent on all invoices for the sale of machines on which patents had been issued. Anderson invented a brake beam safety support which plaintiff, under Sharp's direction, manufactured and sold. Anderson assigned his rights to this invention to Sharp on May 3, 1933. August 21, 1934, John H. Sharp, in a letter addressed to

plaintiff's patent attorney, stated that the brake beam safety support invention was the property of the Sharp estate. Up to the date that Anderson resigned his position with plaintiff, plaintiff paid him the five per cent royalties provided by his contract and on October 11, 1937, plaintiff, in accepting his resignation, wrote him that he would continue to receive his royalty on the brake beam supports.

The record also discloses that Sharp's son John invented a leak-proof bolt and a process for making it, for which he filed applications on May 4, 1931 and on June 23, 1932, and patents 2024069 and 2024070 were issued on December 10, 1935. Concerning these patents John H. Sharp testified that the original bolt was made without cost in Florida in the shop of a railroad and that he made four or five experiments in the work shop of a friend for which he paid the cost. He also testified that plaintiff made a lot of experiments with the bolt in its plant. The testimony also disclosed that commencing December 31, 1930 and up to December 31, 1931, plaintiff expended $5,088.43 in experimenting with and in developing the bolt; that when William E. Sharp accepted the assignment from John he had full knowledge of plaintiff's intention to manufacture and sell the bolt; and there was evidence that plaintiff, under William E. Sharp's direction, caused the bolt to be manufactured and sold. John H. Sharp assigned these patents to his father on December 20, 1930. The assignment was not recorded. It was placed in William E. Sharp's strong box, and plaintiff had no knowledge of its existence until after the death of Sharp. This assignment was executed by John H. Sharp, without any solicitation by William E. Sharp, in return for the cancellation of John's indebtedness to his father amounting to $3,500, incurred in the period between 1925 and 1928.

There is a sharp conflict in the evidence as to a conversation occurring in the office of Thomas G. Deering in June, 1934.

William E. Sharp died testate and defendant was appointed executrix of his will. There was testimony that prior to filing the will for probate, Deering, as an act of friendship to Sharp, offered to probate the will without cost to defendant; that defendant thereupon stated that she might not be able to accept his offered services because there might be a conflict of interest, saying "there is going to have to be a settlement for my patents"; and that when Deering assured defendant that the purchase of the patents would be taken care of in due time, Deering proceeded with the probate of the will, and an inventory of deceased's assets prepared by Deering was filed in the Probate Court of Cook County, Illinois, which included 1333⅓ shares of plaintiff's stock and the patents here in controversy.

Deering testified that he had been counsel for plaintiff and a member of its board of directors since 1918; that he did have a conference with defendant at his office relative to probating the will, but at that conference no question was raised as to a possible conflict of interest; that there was no conversation with reference to any obligation of plaintiff to buy Sharp's stock; and that the only conversation relating to the patents was that defendant said that she would like to sell to plaintiff the patents that had been left to her by her husband.

Upon the death of Sharp, John H. Sharp was elected president and acted in that capacity up to December, 1940. John H. Sharp testified that defendant had inquired of him as to plaintiff's plans concerning the purchase of the stock belonging to the Sharp estate; that he had informed her that plaintiff was in bad financial condition and unable to purchase the stock; and that he had advised her against withdrawing the patents belonging to the estate because a withdrawal of the patents would wreck plaintiff. He also testified that he had discussed the possible purchase of the stock upon the terms of the 1918 contract with Hardy and Tripp, plaintiff's stockholders, and that at no time prior to February 15, 1939, was there any intimation by Hardy or Tripp that plaintiff was not obligated to purchase the stock.

Francis H. Hardy, chairman of plaintiff's board of directors, testified that he never told John H. Sharp that it was plaintiff's intention to buy the Sharp family stock, nor did he say we are getting along just the way we did before on the old contract. Chester D. Tripp, a member of plaintiff's board of directors since 1918, testified that he never said to John H. Sharp that plaintiff would buy the Sharp stock and that he never expressed to John H. Sharp or to any member of the Sharp family the willingness of plaintiff to pay anything for the patent rights under the patents in issue.

After a hearing the trial judge filed a memorandum opinion and made fifteen sep-

arate findings of fact upon which he stated his conclusions of law. In his opinion Judge Holly said: "There is no evidence in the record that the parties ever extended the life of such agreement [contract of 1918] beyond * * * [September 30, 1923] or considered themselves bound by the terms thereof beyond said date. On the contrary there is much evidence that the parties considered it ended then."

It is to be remembered that the trial court has the primary function of finding the facts, weighing the evidence, and choosing from among conflicting factual inferences and conclusions those which it considers most reasonable. The trial court in the performance of that duty made findings of fact. In those findings supported by the evidence are these facts. That for some time prior to 1918 William E. Sharp had been the president and principal executive of plaintiff; that on October 1, 1918, Sharp entered into a five-year employment contract with plaintiff under which he received a salary and certain bonuses, and in which he agreed to assign to plaintiff any inventions which he made. During the life of the contract its terms were observed by both parties.

Upon the expiration of the contract it was not renewed, and thereafter no agreement was entered into relative to any compensation to be paid Sharp for any invention he might make after September 30, 1923, but he was annually re-elected president, and throughout the entire period up to the time of his death, June 4, 1934, he was plaintiff's chief executive officer, his relation to plaintiff being of a highly fiduciary character. He was in complete charge of plaintiff's manufacturing, sales and patent policies, and had full knowledge at all times of plaintiff's plans.

During the period between September 30, 1923 and his death, Sharp made a number of inventions relating to improved nuts of the general type manufactured by plaintiff, and upon machinery and methods of making such nuts, all of which were developed, tested, and perfected in plaintiff's plant with its time, labor, materials, and appliances, and wholly at its expense, upon which patents were issued to Sharp. One machine was invented by Sharp conjointly with plaintiff's employees Sandstrom and Ridlon, to which Sharp secured an assignment, and the patent 1753250 was issued to him.

During Sharp's administration one Anderson was employed by plaintiff to design new products. Anderson's contract required him to assign any invention he might make to plaintiff. Anderson invented a brake beam safety support—which plaintiff, under Sharp's direction, manufactured and sold. This invention was developed in plaintiff's plant wholly at its expense. Sharp obtained from Anderson an assignment of this invention to himself and patent 1976694 issued to Sharp's executrix. Sharp paid the patent soliciting fees for this patent.

John H. Sharp invented a leak-proof bolt and a process of making it. With the intention of embarking on the manufacture and sale of the bolt, plaintiff, under William E. Sharp's direction, spent $5,088.43 in developing and perfecting the bolt. With full knowledge of plaintiff's intention to manufacture and sell the bolt, William E. Sharp, in return for a release of a debt of $3,500 owed to him by John H. Sharp, obtained from John H. Sharp an assignment of the invention and patents to issue thereon.

Upon these facts the court concluded the defendant's counterclaim was without equity; that plaintiff was entitled to a declaratory judgment finding it had shop rights under all the patents on inventions of William E. Sharp and under Sharp's one-third interest in the Sharp, Sandstrom, and Ridlon invention; and that plaintiff was entitled to an assignment of the John H. Sharp patents upon paying to defendant $3,500 and to an assignment of the Anderson patent upon paying defendant whatever amount William E. Sharp had expended in patent solicitor's fees in obtaining that patent, on the ground that when Sharp purchased these patents he took them as a constructive trustee for plaintiff.

Defendant contends that the inventions belong to Sharp free of any shop rights. The argument is that Sharp was employed in a managerial capacity and not as an inventor, and she cites a number of cases. These we have read. They will not be discussed since they are inapplicable or distinguishable on the facts. It will be enough to say that the inventions here in issue were developed and perfected in plaintiff's plant with its time, materials and appliances, and wholly at its expense; hence the court correctly concluded that plaintiff had shop rights under the patents. We are fortified in this belief since the

principle has been established that if an employee in the course of his employment makes an invention using his employer's time and materials, the employer has a free indefeasible license and shop right under the invention and any patent covering the invention, which shop right is co-extensive with the business requirements of the employer, Pure Oil Co. v. Hyman, 7 Cir., 95 F.2d 22; that is to say, because the servant uses his master's time, facilities and materials to attain a concrete result, the employer is entitled to use that which embodies his own property and to duplicate it as often as he may find occasion to employ similar appliances in his business. United States v. Dubilier Condenser Corporation, 289 U.S. 178, 188, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488.

■ Defendant next contends that she is entitled to payment for the reasonable value of the patents. With this contention, under the facts here appearing, we are unable to agree, because as we have already observed, the shop right is automatically and equitably the result of using plaintiff's time, labor and materials in developing the inventions. The authorities[1] cited by defendant in support of her contention do not lead to a different conclusion.

In the Dysart case the invention was made on the employee's time, at his own expense, and the court held that the defendant had no claim to the invention by way of shop right, license, legal or equitable title. In the Corthell case, Corthell entered into a contract with the Thread Company in which he agreed to turn over to it for development all future inventions which he might make for which the defendant promised to make reasonable recognition therefor, the basis and amount thereof, however, to rest entirely with the company. The Parev Products case involved the question whether or not an injunction should issue to enforce an asserted implied negative covenant in a contract granting an exclusive license to use a secret formula for a food product. There was no shop right involved in the Corthell and Parev cases.

■ On the question of whether Sharp took the patents as constructive trustee for plaintiff we note again that Sharp had complete charge of plaintiff's manufacturing and patent policies and that he had full knowledge of plaintiff's plans. In such a case the principles are well settled that where confidence is reposed, it must be faithfully acted upon and preserved from an intermixture of imposition, or to say it another way, in the employment of an agent the principal bargains for the disinterested skill, diligence and zeal of the agent for his own exclusive benefit. Upon entering into the employ of plaintiff, there rested upon Sharp the duty of fidelity to his employer's interest and of acting for the furtherance and advancement of the business in which he was engaged, and not to its injury. Davis v. Hamlin, 108 Ill. 39, 48 Am.Rep. 541; Frohlich v. Seacord, 180 Ill. 85, 54 N.E. 286. This rule has been applied to all sorts of confidential relations. It has been applied to patent property, American Circular Loom Co. v. Wilson, 198 Mass. 182, 84 N.E. 133, 126 Am.St.Rep. 409; and National Wire Bound Box Co. v. Healy, 7 Cir., 189 F. 49, and when the agent is found guilty of a breach of duty in this respect he will be regarded as holding his newly acquired interests as trustee for the principal. 3 C.J.S. Agency, § 140, p. 13.

Defendant does not question these rules, but she insists that those principles are not applicable here. She points to the fact that Deering, in drafting an inventory of the assets belonging to the Sharp estate, included therein the patents in controversy. She also calls attention to testimony tending to show that plaintiff declined to avail itself of the opportunity to acquire the Anderson patent, and she makes the point that where it is sought to establish a constructive trust by parol evidence the proof must be clear, convincing, and so strong and unmistakable as to lead to but one conclusion, Neagle v. McMullen, 334 Ill. 168, 165 N.E. 605, and that under these circumstances the findings were erroneous.

■■ In considering this contention we must bear in mind, as we have already observed, that the trial court has the primary function of finding the facts and choosing from among conflicting factual inferences those which he considers most reasonable. The findings of the trial court on this question are presumptively correct, and will not be disturbed on appeal, unless we can say that they are clearly wrong, Federal Rules of Civil Procedure, rule 52, 28 U.S.C.A. following section 723c. In the instant case

---

[1] Dysart v. Remington Rand, D.C., 40 F.Supp. 596; Corthell v. Summit Thread Co., 132 Me. 94, 167 A. 79, 92 A.L.R. 1391; and Parev Products Co. v. I. Rokeach & Sons, 2 Cir., 124 F.2d 147.

the inferences and conclusions of the District Court have substantial basis in the evidence; hence we cannot say that the findings are clearly wrong.

Finally, defendant contends that the court erred in excluding certain evidence offered by defendant. After considering the arguments and the entire record before us, we find nothing in the rulings of the court to warrant a reversal.

The decree of the District Court is affirmed.