WALLING, Adm'r, Wage and Hour Div.,
U. S. Dept. of Labor, v. RUTHERFORD
FOOD CORPORATION et al.

No. 3213.

Circuit Court of Appeals, Tenth Circuit.

July 18, 1946.

Rehearing Denied Aug. 26, 1946.

Faye Blackburn, of Washington, D. C. (William S. Tyson, Acting Sol., and Bessie Margolin, Asst Sol., both of Washington, D.C., Reid Williams, Regional Atty., of Kansas City, Mo., and David Lichtenstein and Eugene Green, Attys., U. S. Department of Labor, both of Washington, D. C., on the brief), for appellant.

E. R. Morrison, of Kansas City, Mo. (Homer H. Berger, R. L. Hecker, and Morrison, Nugent, Berger, Hecker & Buck, all of Kansas City, Mo., on the brief), for appellees.

Before PHILLIPS, BRATTON and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

The Administrator of the Wage and Hour Division, Department of Labor, brought this action against The George Kaiser Packing Company, hereinafter referred to as Kaiser, and Rutherford Food Corporation, hereinafter referred to as Rutherford, to enjoin the continuation of alleged violations of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq.

Section 2(a) of the Act contains a Congressional finding of the prevalence in industries engaged in commerce or in the production of goods for commerce of certain evils arising out of low wages and long working hours which are detrimental to commerce. Section 2(b) declares the policy of the Act to be the elimination of such conditions without substantial curtailment in employment or earning power. Section 3(b) defines "commerce" as "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." Section 3(d) defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee * * *." Section 3(e) defines "employee" to include "any individual employed by an employer." Section 3(g) provides that "employ" shall include "to suffer or permit to work." Section 6 relates to minimum wages of employees. Section 7 addresses itself to maximum hours of such employees and provides for increased compensation for work performed in excess of the maximum hours specified. Section 15 provides that it shall be unlawful "to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 6 or section 7 * * *." And section 17 vests in the District Courts of the United States jurisdiction to restrain violations of Section 15.

Kaiser owns a slaughterhouse plant in Kansas City, Kansas, and Rutherford owns a canning plant in Kansas City, Missouri. Rutherford had contracts to furnish the armed forces of the United States large quantities of canned chili and it was meeting difficulty in obtaining an adequate supply of boned beef for that purpose. In March, 1943, for the primary purpose of obtaining a steady supply of boned beef, Rutherford acquired the controlling interest in Kaiser and also acquired an outstanding debenture issued by Kaiser in the sum of $10,000. Thereafter, Rutherford advanced money to Kaiser from time to time resulting in Kaiser becoming indebted to Rutherford for more than $50,000 on open account, in addition to the debenture. To avoid further operation of Kaiser at a loss and to assure itself a future supply of meat, Rutherford, on July 1, 1943, leased the slaughterhouse plant from Kaiser, transferred all of the employees of Kaiser to its own pay roll without change in payroll practices, and operated the plant until May 1, 1944, at which time the lease was cancelled by mutual agreement. Kaiser then resumed operation of the plant with no material alteration in payroll practices. Prior to March, 1943, there was little or no business connection between the two companies. After termination of the lease, more than ninety-five percent of the output of meat at the plant was sold to Rutherford, virtually all of which was used in the production of chili, and virtually all of the chili moved in commerce.

Prior to October, 1942, Kaiser employed a combined butcher, beef boner, and order filler in the cooler of the plant. In October, 1942, when Kaiser undertook to produce boned beef for war agencies, it needed additional boners. It entered into a written contract with Reed and Peterson, two experienced boners, which provided that Reed should do the boning at the plant for forty cents per hundred pounds of boneless beef; that he should perform the work as an independent contractor; that he should em-

ploy and compensate his employees; that his employees should be subject to his sole direction and control; and that Kaiser should not have the right to direct or supervise the work of Reed or his employees. Reed and Peterson assembled a group of boners consisting generally of themselves and about four others and did the boning for about four months. Reed and Peterson then abandoned the work without notice and Schindel, an experienced boner working at the plant, took it over under an oral agreement with Kaiser to continue under the terms of the contract with Reed. Schindel assembled a similar group and they did the work for about fifteen months. Schindel then quit without notice and the work was taken over on the same basis by Hooper and Deere, both of whom had been working at the plant as boners. After about five months Deere withdrew and Hooper then entered into a written contract with Kaiser. The contract was substantially similar to the one entered into with Reed, except in two respects. It provided that the price should be forty-five cents per hundred pounds of boneless beef and that a rental of $100 per month should be paid for the room in the plant in which the boning was done, but no rent was ever paid. Hooper and the group of boners assembled by him then did the boning. Throughout these several arrangements, the amount due for the boning was paid in weekly lump sums to Reed, Schindel, Hooper and Deere, and Hooper, respectively, and the amount was then divided among the boners, including those just mentioned by name. Most of the boners worked in excess of the maximum hours per week specified in the Act, without receiving any overtime compensation for the overtime worked, and the plant operator has not kept any records relating to the time they actually worked.

The first step in the operation of the plant is to move the cattle from the holding pen into a room where they are killed, skinned, and dressed. The carcasses are then moved by means of an overhead rail system into the hot cooler, then to the main cooler, and then into the boning vestibule. While the carcasses are still on the rail in the boning vestibule, the persons moving them in there make a final check and remove any small pieces of hide, fat, or dirt, after which the carcasses are weighed on the rail scale and switched onto the boners' detour rail. They are then boned. The division among the boners of the different steps in the boning is determined by the boners. As the meat is removed from the bones it is thrown into barrels or to a trimmer. As the barrels are filled they are removed from the boning vestibule to the dock, weighed, put on trucks, and hauled to Rutherford or other purchaser. The barrels are washed in a room at one end of the dock. The persons moving the carcasses into the boning vestibule, the trimmer in the boning vestibule, the persons who bring the barrels into the boning vestibule, and the persons who move the boned beef from the boning vestibule to the dock are all employees of the plant operator. The tables, barrels, and rails in the vestibule are owned by Kaiser, but the boners furnish their own hooks, knives, and leather belts. The plant operator furnishes the aprons worn by the boners and has them laundered. The boners determine their hours of work, but they are required to keep the work current and the hours they work depend in large measure upon the number of cattle slaughtered. The president and manager of Kaiser is all over the plant many times a day. He goes into and through the boning vestibule on an average of a dozen times a day, and he is after the boners frequently about their failure to cut all of the meat off the bones. The plant had continuous successive union contracts since 1941 with the local union of the C. I. O. which provided for a closed shop and check-off system and for recognizing the union as the sole collective bargaining agency for all maintenance, piece workers, and production workers in the plant. Jobs were classified and wage scales and conditions were determined by these contracts. The boners were not classified or mentioned in any of the contracts and the union did not ask that they be brought under the plant contracts, but the union required that all boners be members of the union. The boners were members of the union, but the plant operator did not collect their dues and the check-off system was not made applicable to them. The plant operator never included the boners in its Workmen's Com-

pensation liability policy and never made any deductions for unemployment compensation or withholding taxes. Neither did the plant operator make any application to the Regional War Labor Board for approval of sums or rates paid to boners collectively or individually. Apart from the boners, a small number of employees of the plant operator regularly worked in excess of the maximum hours per week but received no overtime compensation for their overtime hours. In some instances inaccurate records were maintained, and in some wages were paid out of petty cash with no record of the time worked.

Entertaining the view that the boners were not employees of Kaiser, within the meaning of the Act, but were independent contractors; and entertaining the further view that the violations of the Act in respect of the small number of employees of Kaiser were minor and without fixed purpose to disregard the Act, the court denied the injunction and the Administrator appealed.

 The strongly contested issue to which the parties devote most of their argument is whether the boners were and are employees of Kaiser, within the purview of the Act, or were and are independent contractors. In respect of coverage of employees, the definitive provisions of the Act are extremely comprehensive in their sweep. United States v. Rosenwasser, 323 U.S. 360, 65 S.Ct. 295, 89 L.Ed. 301. The Act is remedial and must be given a liberal construction with its manifest intent and purpose in view. E. C. Schroeder Co. v. Clifton, 10 Cir., 153 F.2d 385, certiorari denied, 66 S.Ct. 1351; Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52; Bowie v. Gonzalez, 1 Cir., 117 F.2d 11; Fleming v. Palmer, 1 Cir., 123 F.2d 749, certiorari denied Caribbean Embroidery Co-op v. Fleming, 316 U.S. 662, 62 S.Ct. 942, 86 L.Ed. 1739; Helena Glendale Ferry Co. v. Walling, 8 Cir., 132 F.2d 616. And in doubtful situations, coverage is to be determined broadly by reference to the underlying economic realities rather than by traditional rules governing legal classifications of master and servant on one hand, and employer and independent contractor on the other. Cf. National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170.

 It has been frequently held in cases involving liability in damages for tort that the relation of master and servant exists where the employer has the right to direct and control the method and manner in which the work shall be done and the result to be accomplished, while an independent contractor is one who engages to perform service for another according to his own method and manner, free from direction and control of the employer in all matters relating to performance of the work, except as to the result or the product. And that test along with others has been taken into consideration in determining whether a group of workers were within the coverage of the Act, supra. Jones v. Goodson, 10 Cir., 121 F.2d 176. But it is not necessarily decisive in a case of this kind, as the Act concerns itself with the correction of economic evils through remedies which were unknown at common law, and if it expressly or by fair implication brings within its ambit workers in the status of these boners, it is immaterial whether under the principles of the common law the relationship between Kaiser and the boners has been that of employer and independent contractor for other purposes. Walling v. American Needlecrafts, Inc., 6 Cir., 139 F.2d 60.

 The operations at the slaughterhouse constitute an integrated economic unit devoted primarily to the production of boneless beef. Practically all of the work entering into the unit is done at one place and under one roof. Part of it precedes that of the boners and part follows, but there is no break in continuity. The boners work alongside admitted employees of the plant operator at their tasks. The task of each is performed in its natural order as a contribution to the accomplishment of a common objective. The work of all is interrelated and co-acts in making up the single economic unit. The work of the several employees, including the boners, bears marked similarity in interrelated association and effect to that of employees at a conventional assembly-line production plant. In addition to Kaiser furnishing without payment of any rental the room in which the boning is done, to keeping it clean, and to paying

the agreed price for the boning, the manager of the plant is in the room from time to time every day observing the work and complaining to the boners that too much meat is being left on the bones. These underlying economic realities, considered in their composite effect, lead to the conclusion that the boners were and are employees of Kaiser, within the meaning of the Act. Fleming v. Palmer, supra; Walling v. American Needlecrafts, Inc., supra.

This brings us to the part of the case relating to the other employees in respect of whom there has been a failure to comply with the provisions of the Act. In a case of this kind the trial court is vested with broad discretion in determining whether an injunction should issue. Walling v. Mid-Continent Pipe Line Co., 10 Cir., 143 F.2d 308. But the discretion must be exercised with due regard for the objectives of the Act. Lenroot v. Interstate Bakeries Corp., 8 Cir., 146 F.2d 325. And while the action of the court in withholding the issuance of an injunction ordinarily will not be disturbed on appeal, in view of the extent of the violations of the Act, their nature, the period of time over which they extended, and the other circumstances reflected in the record, we think the court should have enjoined their continuation or the commission of like violations in the future.

The judgment is reversed and the cause remanded for the entry of a judgment substantially as prayed for in the complaint.

PHILLIPS, Circuit Judge (concurring).

Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides that "Findings of fact shall not be set aside unless clearly erroneous, * * *" On appeal, a finding of fact made by the trial court, if supported by substantial evidence, is binding on this court.[1]

The credibility of witnesses, the weight to be given to their evidence,[2] and the inferences which may be reasonably drawn from the evidence are matters within the province of the trial court.[3]

Here, the trial court found that in 1942 the United States government began purchasing large quantities of beef boned to Army specifications; that the George Kaiser Packing Company[4] had never done any such boning; that Kaiser made inquiries respecting boners which came to the attention of Jim Reed, an experienced boner, who had previously boned beef under independent contractors who employed boners and did the work on a hundredweight basis; that Reed proposed to bone beef for Kaiser on the same basis; that, thereupon, Kaiser entered into a contract with Reed for the boning of all meat ordered from Kaiser for canning; that in such contract, it was agreed that Reed would furnish all labor and equipment and bone the meat; that Reed should receive 40 cents per hundred pounds of boned meat; that Kaiser would furnish the tables on which the boners were to work and provide barrels, properly cleansed from time to time, into which the various types of boned meat, bones, and other portions of the carcasses were to be placed; that Kaiser would deliver to Reed, for boning, all carcasses of beef ordered from it by the United States government, or by canners working on government contracts; that Reed would complete, each day, the boning of all carcasses delivered to him by Kaiser; that Reed should perform the work "as an independent contractor in the vestibule of the Kaiser Packing Plant"; that Kaiser would deliver the

[1] United States v. Linde, 10 Cir., 71 F.2d 925; Board of Com'rs of Caddo County, Okl. v. United States, 10 Cir., 87 F.2d 55, 57; Nielsen v. General American Life Ins. Co., 10 Cir., 89 F. 2d 90, 93, 110 A.L.R. 1133; McCarthy v. Wynne, 10 Cir., 126 F.2d 620, 623; Viles v. Prudential Ins. Co. of America, 10 Cir., 107 F.2d 696, 698, 699; Ryan v. Denver Union Terminal Ry. Co., 10 Cir., 126 F.2d 782, 784.

[2] National Mut. Casualty Co. v. Eisenhower, 10 Cir., 116 F.2d 891, 895; Camden Woolen Co. v. Eastern S. S. Lines,

1 Cir., 12 F.2d 917, 919; Flack v. Holtegel, 7 Cir., 93 F.2d 512, 515; Kincade v. Mikles, 8 Cir., 144 F.2d 784, 787; Columbus Outdoor Advertising Co. v. Harris, 6 Cir., 127 F.2d 38, 42.

[3] Limbach v. Yellow Cab Co., 7 Cir., 45 F.2d 386, 387; United States v. Gamble-Skogmo, 8 Cir., 91 F.2d 372, 374; Continental Petroleum Co. v. United States, 10 Cir., 87 F.2d 91, 95; Grip Nut Co. v. Sharp, 7 Cir., 150 F.2d 192, 196; Bradley v. Smith, 7 Cir., 114 F.2d 161, 165; Kincade v. Mikles, 8 Cir., 144 F.2d 784, 787.

[4] Hereinafter called Kaiser.

carcasses to Reed on the overhead rail in the vestibule and pick up the boned meat and waste after it had been placed in the barrels by Reed; that Reed would perform the work in compliance with government specifications and regulations, and in accordance with the directions of government inspectors; that Reed would employ, compensate, and be responsible for all, of his employees; that such employees should be under and subject to the sole direction and control of Reed, and that Kaiser would have no right to supervise or direct the work of Reed or any of his employees; that Reed would carry workmen's compensation and employer's liability insurance and protect, indemnify, and defend Kaiser from and against any injuries to persons or property caused by Reed or any of his employees; that the beef, when boned, would be packed in separate boxes, each containing one hundred pounds of boned beef; that Kaiser would keep a record of the weights, subject to Reed's inspection, and furnish Reed with a daily copy thereof; that settlements at the contract price would be made on a weekly basis running from Thursday of each week through Wednesday of the following week; that the contract would continue in force from October 15, 1942, through the duration of the war, subject to the right of either party to terminate it on two weeks' notice.

The court further found that Reed assembled a crew of boners and carried on the work under the contract until February, 1943, at which time Reed ceased performance of the contract; that Schindel, an experienced boner then working for Reed, orally agreed to continue the work under the terms of the Reed contract; that Schindel assembled a crew of boners and carried on the work for one year and three months; that in May, 1944, Schindel ceased performance of the contract and Hooper and Deere, who were then working for Schindel as boners, took over the contract; that Hooper executed a written contract with Kaiser on October 28, 1944, which is still in force; that the Hooper contract is substantially the same as the Reed contract, except that the former provides that Hooper shall pay $100 monthly rental for the vestibule; that the maximum quantity of beef that may be required to be boned shall be 40,000 pounds per day, and the price shall be 45 cents per hundredweight; that Reed and his successors used different methods for compensating the boners, sometimes paying them on an hourly basis, but that sharing has been the predominant method; that from May, 1944, to October, 1944, the money paid for the boning was divided equally between Hooper and Deere, and they paid their boners on an hourly basis; that since November, 1944, the money paid to Hooper has been equally divided among the boners, including Hooper; that Kaiser has paid for the boning by weekly checks issued to the contractor; that all the boners were engaged by Reed or his successors; that at no time has Kaiser exercised any direction or control over the boners, hired any boners, or made any arrangements or agreements with respect to the compensation of any boner; that Kaiser has had nothing to do with the wages, rate of pay or amount received by any individual boner and has never exercised any direction or control over the sharing or division of the boning money; that the boners determined their own hours of work and Kaiser has not controlled and has not had the right to control their hours of work; that the boners sometimes worked only three or four hours a day, on other days worked eight hours, and, in rare instances, worked in excess of eight hours; that they sometimes worked six days a week, aggregating 42 to 45 hours; that the boners furnished their own tools and determined among themselves the division of the steps in the boning process; that boning is a special art, requiring training and experience; that Kaiser has never treated or classified the boners as its employees, has not included them in its workmen's compensation policy, and has not made deductions for withholding taxes; that the plan under which the boners worked is one commonly used in other packing plants; that the contracts with Reed and his successors were not sham and deceptive arrangements, but were necessitated by the exigencies of the situation confronting Kaiser when it entered into the contract with Reed.

The trial court found the same facts with respect to the Rutherford Food Cor-

poration[5] during the period it operated the plant.

The findings of fact made by the trial court and the inferences drawn by the trial court from the evidence find substantial support in the evidence.

Whatever might be our conclusion, if we were free to determine the issues of fact and the inferences to be drawn from the evidence, I do not think we are warranted, in the light of the facts found by the trial court, to draw the conclusion that the boners were employees of either Kaiser or Rutherford.

It is my opinion, however, that the evidence disclosed other violations of the Fair Labor Standards Act by Kaiser and Rutherford with respect to persons directly in their employ and that an injunction should have been granted in respect to such violations. See Walling v. Mid-Continent Pipe Line Co., 10 Cir., 143 F.2d 308, and Bowles v. Nu Way Laundry Co., 10 Cir., 144 F.2d 741.

[5] Hereinafter called Rutherford.