Louis L. Friedman, J.
Plaintiff brought this action to recover damages for personal injuries sustained by her on Saturday, September 27,1952, at about 11:30 in the morning, due to a fall on a moving escalator which was located at the Journal Square station in Jersey City, New Jersey. The defendant Pennsylvania Railroad Company, (hereinafter designated as “ Pennsylvania ”) owned the station and had leased it to the defendant Hudson & Manhattan Railroad Company (hereinafter designated as “Hudson”). The defendant, The Peelle Company (hereinafter designated as Peelle) had installed the escalator in February, 1952, seven months before the accident, and maintained and serviced it pursuant to the terms of a written contract.
On May 29,1953 plaintiff fell again while she was in the living room of her home. She alleges that this second fall was caused by a severe dizzy spell, which occurred as a result of the injuries sustained by her in her accident in September of 1952, and she asks for damages for the immediate injuries resulting from the first fall, as well as for the consequential damages sustained as a result of the second fall.
At the time of the original accident, plaintiff was a passenger of the defendant Hudson, having ridden on its train from New York City to the Jersey City station. Leaving the station from the train level, she was required to go upward to the street level, and in order to do so, went upon an ascending escalator. This escalator was one of two located at the station and has been referred to upon the trial as the wider one. The only difference between the two escalators was that the wider one accommodated two persons on any one step, while the narrower one could only accommodate one person. The two escalators were located side by side, adjacent to and parallel with each other, and the movements of the steps were controlled either upward or downward through the use of a starting key which could be turned in either direction. Plaintiff said that she was accompanied at the time by a niece, the niece’s husband and their two minor children, and that after the two children had gotten on the wider escalator, side by side, the niece and her husband got on to another step, *90 also alongside of each other. Plaintiff then mounted a step which was one or two steps below the niece. The escalator had ascended several steps when it suddenly jerked and lurched, 'causing her to lose her balance, fall backwards, and strike her head on one of the iron steps. She said that she immediately 'became unconscious, remembering nothing thereafter until she found herself on the upper floor of the station being ministered to by some people. Medical aid was offered to her by some of the employees of Hudson, but she refused it, preferring instead to go to the home of a relative in New Jersey, where she remained for several hours and then returned home. When she ascertained that her injuries did not permit her to take care of herself, and since she lived alone, the niece remained with her overnight, and the next day she was taken to her son’s home in Yonkers where she remained in bed for several weeks, receiving medical attention during that time. She then returned to her own home, continuing to receive medical treatment, this time from her own physician who had been treating her theretofore for diabetes, and after several additional weeks in bed in her own home, attended by a neighbor, she started to walk about. The proof is convincing to this court that plaintiff sustained a concussion of the brain as a result of that first fall, the result of which concussion left her with severe headaches and dizzy spells, and that it was one of these dizzy spells which caused her to fall again on May 29, 1953 as a result of which latter fall she sustained additional injuries in the region of her right hip.
Plaintiff’s testimony as to the manner in which the accident happened, was corroborated by both her niece and the niece’s husband. They described the jerk or lurch as being severe enough to make the niece, too, lose her balance, but the niece’s fall was prevented by the action of her husband, who, standing alongside of her, was able to grab and support her. In addition to the testimony of these two relatives, the testimony of the plaintiff was corroborated by one Rev. Otto Louis Schreiber, a Lutheran minister, whose church was located in Jersey City, and who testified that he happened to be on the descending smaller escalator almost adjacent to the spot where plaintiff was when he suddenly heard a scream, looked in the direction of plaintiff and saw her topple down. He was a stranger to the plaintiff at that time, but, seeing the accident, he immediately ran to the bottom of the escalator upon which he was descending, then to the adjacent one on which the plaintiff was then lying unconscious and which was then still ascending, ran up the steps and lifting the plaintiff up, supported her until the portion of the escalator where they were then standing *91 had reached the upper floor. He remained with her until she recovered consciousness, and helped to take her to the office of one of the Hudson employees, which was located on a lower floor. The witness said that while he was on this ascending escalator supporting the plaintiff, the escalator jerked and lurched and ran in such an unusual manner, that it was readily ascertainable to him. Cross-examination failed to weaken his direct testimony, but rather buttressed it, as it was then brought out that he was a frequent user of the station and the escalator, and on a number of prior occasions had noticed and observed it operating with the same jerking and lurching motion as occurred at the time of the accident.
The witnesses called by the defendants gave detailed testimony as to the operation of the escalator, its component parts and safety features. Although there was some difference of opinion between the experts as to whether an escalator such as this one, could have been in any way defective without coming to an immediate stop, the sum total of their testimony was to the effect that it could not lurch or jerk in the manner described without one of the safety features coming into operation and thus stopping the escalator from moving any further. If that happened, said the defendants, the escalator could not then be again started without the use of a key. All of the expert witnesses admitted, however, that as a mechanical device, there could be defects which required repairs from time to time, and that a new escalator such as the one now being discussed, was particularly amenable to such defects because it was necessary for some time after it was put into operation, to watch that operation so as to eliminate the “ bugs ” or “ kinks ” which exist in every new installation. The proof shows that Peelle did in fact make repairs and replacements to this escalator even though it was a comparatively new one.
The expert witness called by defendant Peelle, inspected the escalator some months after the accident, and after describing the details of its construction and manner of operation, he admitted that a new escalator has “ bugs ” and “ kinks ” for a number of months after installation, and that it is necessary to inspect such an escalator from time to time in order to insure its smooth performance. He admitted that parts which at first glance appear to be perfectly safe and satisfactory, sometimes prove defective under the strain and stress of operation, and that it is only the operation of the escalator itself, which reveals that such defects may exist. Although a great deal of testimony was produced to support defendants’ contention that the escalator could not jerk or lurch and yet continue to operate, the *92 defendant Peelle’s expert admitted that there could be such a thing as a frozen bearing which would keep the step wheel from turning, and would cause that wheel to be pulled along the track provided therefor, emitting a sound like a tire screech, but at the same time not bringing one of the safety features into play so that the escalator would have to stop.
The other witnesses produced by this defendant were mechanics who helped install the escalator and whose job it was to service the same, and they testified that they found it necessary to make repairs on the escalator on various occasions, to replace parts, and to make inspection, and for that purpose they kept their equipment, tools and replacement parts at the railroad station. They admitted that whenever it was necessary to do so for the purpose of inspecting, servicing or repairing this escalator, they had the right to close down its operation, without securing the prior consent of the other defendants.
It appears from one of the two contracts entered into between Hudson and Peelle, that Peelle had not only obligated itself to maintain the escalator, to inspect it and to keep it in good operating condition, but had likewise obligated itself to be responsible for damages which Hudson might sustain and which was caused by the failure of Peelle to properly maintain the escalator. It is immediately apparent that at least for the purpose of protecting itself under that contract, Peelle would have a right at any time, whenever it appeared to said Peelle or its employees that the escalator did not operate properly or that it might not in the future operate properly, to shut down said escalator’s operation and to exclude Hudson’s passengers therefrom. It appears without question, therefore, that both the defendant Hudson and the defendant Peelle jointly exercised control over this escalator.
The essence of the testimony adduced on behalf of defendants, was to the effect that this accident could not have happened in the manner described. The court, however, credits the testimony offered in behalf of the plaintiff, and finds therefrom and from other cogent evidence in the case, that the accident did in fact happen as claimed, and that plaintiff was caused to fall as a result thereof and to sustain the injuries alleged. Defendants’ attempt to show that plaintiff fell because of a dizzy spell due to a diabetic condition, is not supported by any proof, and defendants’ theory in that regard is not credited by the court. The court has come to the further conclusion, that it was as a result of the fall on the escalator, that plaintiff thereafter suffered from serious and severe dizzy spells and that it was one of these dizzy spells, attributable to the *93 accident on the escalator in question, which caused the subsequent fall in plaintiff’s apartment in May of the following year.
The question then presents itself as to which of the defendants is or are liable to plaintiff for the injuries sustained. Plaintiff’s proof only tended to show the accident and the resultant injuries. She offered no proof as to the cause of or the reason for the occurrence. Since she did nothing improper while on the escalator, she is not guilty herself of any negligence, and since she was injured as a result of a jerking or lurching thereof, and the court so finds, plaintiff made out a prima facie case under the res ipso loquitur doctrine. (Ross v. Bloomingdale Bros., 205 Misc. 104; Whylie v. Craig Hall, Inc., 272 App. Div. 603.) The proof offered on behalf of defendants falls far short of offering an explanation for the occurrence and fails to estop the court from inferring negligence from the occurrence of the accident. (Cf. Griffin v. New York Central R. R. Co., 277 App. Div. 320, 323.) The explanation offered by the defendants is not credited and is rejected. (Bressler v. New York R. T. Corp., 277 N. Y. 200; United States v. Washington Dehydrated Food Co., 89 F. 2d 606; Wineburgh v. Seeman Bros., 21 N. Y. S. 2d 180; Gallagher v. New York Dock Co., 19 N. Y. S. 2d 789, affd. 263 App. Div. 878.) The court finds that there was negligence in the failure of the defendants who are here held liable, to supply the plaintiff with a reasonably safe escalator, and that said escalator was not safe due to the improper manner in which the same was maintained.
This doctrine of res ipso loquitur is applicable both against the defendant Hudson, who admittedly managed and controlled said escalator, and the defendant Peelle which likewise controlled and maintained it, and which was responsible for its safe and proper operation. The proof shows without question that Peelle had agreed to service the escalator at least once a week, that it was solely in charge of service and maintenance under its contract with Hudson, that it had the right to service it as often as Peelle deemed necessary, and had the right to control its operation or nonoperation at any time, depending upon when Peelle decided to service or inspect or make repairs thereto. Such control of the escalator was either simultaneous or in necessary rotation with the defendant Hudson. It is not essential for the application of the res ipso doctrine that there be but a single person in control of that which caused the damage. (Schroeder v. City & County Sav. Bank, 293 N. Y. 370.) Where, as here, some or all of the interdependent defendants are in control of an instrumentality which is involved in an accident due to its improper operation, they are thereupon *94 called upon to explain such operation. (Cf. Schroeder v. City & County Sav. Bank, supra.) Stafford v. Sibley, Lindsay & Curr Co. (280 App. Div. 495) is readily distinguishable on the facts and is not authority here for a contrary ruling.
As to the defendant Pennsylvania, it owned the station, and the prima facie proof is sufficient to show that it also may have been in control thereof. However, upon the facts before the court, its nonliability is apparent and it is entitled to judgment dismissing the plaintiff’s complaint as against said Pennsylvania. Its cross complaint against Peelle, therefore, becomes academic, and is dismissed as such.
On the cross complaint of the defendant Hudson against the defendant Peelle, the proof indicates without question that said defendant Peelle was guilty of active negligence, in that in servicing and maintaining the escalator, it failed to keep it in safe and proper repair and operation, as it was obligated to do, while defendant Hudson was only guilty of passive negligence in the breach of its duty to the plaintiff. Additionally, Peelle, as part of its maintenance agreement with Hudson, agreed to indemnify said defendant Hudson against any loss or liability arising out of any action for injury occurring or arising directly or indirectly “ out of or by reason of any act, default, omission or happening on our part or on the part of any of our officers * * * employees * * * or other persons admitted into * * * your premises and particularly out of any defect in the motor stairs unit which we propose to maintain or out of any accident caused by failure properly to maintain.” Since the court has found that plaintiff’s injuries were due to the negligent and improper manner in which the escalator was maintained, defendant Peelle is obligated to indemnify defendant Hudson under both common law and by virtue of its written agreement to that effect, and the judgment to be entered herein will so provide.
On the question of damages, the court finds that plaintiff suffered from a concussion of the brain as the result of her accident in September, 1952 and that one of the dizzy spells which occurred by reason thereof, caused her to fall in May of 1953. Since there was no proof in the record that any negligence on the part of the plaintiff contributed to either the first or the consequential accident, the defendants herein held responsible for the first accident, must, therefore, be and they are hereby required to respond in damages for both the original injuries and the consequential injuries. (Wagner v. Mittendorf, 232 N. Y. 481.) Plaintiff sustained a serious fracture of the right femur for which she was hospitalized for a *95 protracted period of time, and later hospitalized again. The hospital record, which together with all the other evidence in the case has been carefully examined by the court, indicates that several years after the May, 1953 accident, there was still poor union of the fragments and a substantial amount of displacement. It was further apparent that the Smith-Peterson nail which had been placed in the femur to hold the fragments-together, had penetrated through the bone and had caused! injury to the acetabulum. There were other after-effects from the injuries sustained, all of which are sufficiently outlined and: detailed in the record and which require no great elaboration here. It was apparent from the hospital records, and from the details of the sedatives and narcotics which were given to plaintiff during her stay in the hospital, that she suffered from a great deal of pain. At the trial, about four years after the May, 1953 accident, it was obvious and apparent that she was still suffering from a great deal of pain and discomfort, and the court observed evidences thereof, even while plaintiff was seated in the back of the court room when she did not know that she was being observed. At the time of the accident, plaintiff had a life expectancy of 13.18 years, and after having walked with crutches for some time, she has been walking with a cane and will be required to use such a support for the rest of her years. For demonstration purposes, the court observed the way she walked both with and without the use of a cane, and the disability of the plaintiff is real and permanent. She has a very decided sideward and downward movement when she steps on the injured leg, which is not even corrected by the built-up shoe which she is wearing, and, for a woman of her years who lives by herself and must take care of herself physically, her injuries are extremely serious.
For these injuries, the court awards her damages in the sum of $50,000, together with her out-of-pocket special damages which are detailed in the record and which amount to $2,968.40, making in all a total of $52,968.40.
Accordingly, the court awards judgment in favor of the plaintiff against the defendants Hudson and Peelle for the sum of $52,968.40; and in favor of the defendant Pennsylvania, dismissing the plaintiff’s complaint. The court also awards judgment over on the cross complaint in favor of the defendant Hudson and against Peelle, for the amount of the judgment, including costs, which will be entered herein against, said defendant Hudson.
All motions upon which decision was reserved, are decided adversely to the defendants, except as herein disposed of. *96 Exception is granted to the defendants Hudson and Peelle, and to the plaintiff as to the dismissal of her complaint as against the defendant Pennsylvania. Thirty days’ stay of execution and 60 days to make a case is granted to each of the parties.